**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**BRIAN AUCLAIR,**

                                        **Plaintiff,**

        **vs.**                                                        **1:21-CV-633**
                                                                       **(MAD/DJS)**

**CORNING INCORPORATED and CORNING**
**PROPERTY MANAGEMENT CORPORATION,**

                                        **Defendants/Third**
                                        **Party Plaintiffs,**

        **vs.**

**LAYNE CHRISTENSEN COMPANY,**

                                        **Third Party**
                                        **Defendant.**
_____

**APPEARANCES:**                                **OF COUNSEL:**

**BUCKLEY, MENDELSON**                           **JOHN J. CRISCIONE, ESQ.**
**LAW FIRM**
29 Wards Lane
Albany, New York 12204
Attorney for Plaintiff

**MONACO COOPER & CARR PLLC**                    **MACKENZIE C. MONACO, ESQ.**
1881 Western Avenue                              **GINA T. WISNIEWSKI, ESQ.**
Suite 200                                        **NORAH M. MURPHY, ESQ.**
Albany, New York 12203
Attorneys for Defendants/Third Party
Plaintiffs

**FRANTZ WARD LLP**                              **ANGELA D. LYDON, ESQ.**
200 Public Square – Suite 3000                   **JAMES B. NIEHAUS, ESQ.**
Cleveland, Ohio 44114
Attorneys for Defendants/Third Party
Plaintiffs

**BARCLAY DAMON LLP**                            **ALAN R. PETERMAN, ESQ.**

Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202
Attorney for Third Party Defendant

**BARCLAY DAMON LLP**                    **WILLIAM C. FOSTER, ESQ.**
80 State Street
Albany, New York 12207
Attorney for Third Party Defendant

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

On April 23, 2021, Plaintiff Brian Auclair initiated this action through the filing of a

complaint against Defendants Corning Incorporated and Corning Property Management

("Corning") in state court. *See* Dkt. No. 2. Corning removed the action to this Court on May 28,

2021. *See* Dkt. No. 1. Plaintiff alleges violations of New York Labor Law sections 200, 240(1),

241(6), and a common law negligence claim. *See* Dkt. No. 2. Corning filed a Third-Party

complaint against Third-Party Defendant Layne Christensen Company ("Layne") on October 19,

2021. *See* Dkt. No. 27. Corning alleges contractual indemnification and breach of contract

claims. *See id.* Presently before the Court are three motions for summary judgment: Layne's

motion against Plaintiff (Dkt. No. 64); Corning's motion against Plaintiff (Dkt. No. 66); and

Corning's motion against Layne (Dkt. No. 65). Plaintiff responded to the motions against him.

*See* Dkt. No. 74.[1] Layne and Corning responded and replied. *See* Dkt. Nos. 72, 77, 80, 81, 82.

---

[1] Plaintiff labels his filing as a cross-motion and a response in opposition. *See* Dkt. No. 74.
However, it is not a cross-motion because he does not request a grant of summary judgment.
Rather, he argues that Layne and Corning's motions should be denied because issues of fact exist,
and he requests leave to amend his complaint. *See id.*

BACKGROUND[2]

In short, this case concerns a workplace injury that Plaintiff suffered on May 14, 2018, while working for his employer, Layne (the sub-contractor) in Corning's (the contractor) facility. Plaintiff was working alongside another Layne employee, Phillip Tripp, to lift a water pump out of the ground. They were using a chain fall and trolley system that hung from an I-beam when the chain fall and trolley came off of the I-beam and hit Plaintiff.

Corning produces cellular ceramic emission controls. *See* Dkt. No. 74-2 at ¶ 1. Corning's diesel plant contains three cooling tower pumps that provide the water used to cool manufacturing and facilities' support equipment. *See* Dkt. No. 65-15 at ¶ 2; *see also* Dkt. No. 74-2 at ¶ 4. The pumps send water out of a caisson and circulate water throughout the diesel plant. *See* Dkt. No. 65-15 at ¶ 12. The pumps send out between from 3,000 and 5,000 gallons of water per minute. *See* Dkt. No. 74-2 at ¶ 14. There are three pumps: two in the south pump room and one in the north pump room. *See* Dkt. No. 65-15 at ¶ 12. Corning's Maintenance and Facilities Department oversees the pump rooms and cooling towers. *See* Dkt. No. 74-2 at ¶ 5. Justin Dusseault was the head of Environmental Health and Safety at Corning's plant. *See id.* at ¶ 6. Dusseault believed that an I-beam was part of the plant's original construction to facilitate the servicing of the cooling pumps and to position a hoisting apparatus over the pumps so that the pump components could be lifted. *See id.*

---

[2] The facts are derived from the parties' statement of material facts and the responses thereto. *See* Dkt. Nos. 64-1, 66-3, 74-2, 80-1, 81-1. Plaintiff filed a response, objecting to specific statements made in Corning's statement of material facts. *See* Dkt. No. 74-3. In Plaintiff's memorandum of law, he "refers the Court to Plaintiff's Objections to Defendant and Third-Party Defendant's Statement of Material Facts . . . ." Dkt. No. 74-1 at 3. However, he titles the document "Plaintiff's Objections to Defendant Corning's Statement of Material Facts." Dkt. No. 74-3 at 1. There is not a similar document related to Layne's statement of material facts. Thus, the Court will deem admitted any properly supported facts as outlined in Layne's statement of material facts. *See* Dkt. No. 64-1; *see also* N.D.N.Y. L.R. 56.1(b).

Layne is a contractor who specializes in the municipal, industrial, and agricultural water well industry. *See* Dkt. No. 65-15 at ¶ 4. Generally, Layne performed preventative maintenance on Corning's cooling tower pumps on an annual basis. *See id.* at ¶ 5. Plaintiff explains Layne's work as well drilling, pump installation, and repair for municipal and large industrial facilities. *See id.* at ¶ 7. Corning denies this statement only to the extent that it does not acknowledge that Layne also performs routine preventative maintenance on the pumps. *See* Dkt. No. 81-1 at ¶¶ 7-8.

Plaintiff contends that Layne has been performing pump servicing and repair for Corning since 2013. *See* Dkt. No. 74-2 at ¶ 8. Corning and Layne agree that Layne was first hired in 2012. *See* Dkt. No. 65-15 at ¶ 3. Corning states that Layne performed preventative maintenance for Corning "generally on a yearly basis," but Plaintiff disagrees to the extent that there is no evidence that Layne did any work for Corning in 2017. Dkt. No. 66-3 at ¶ 5; Dkt. No. 74-2 at ¶ 1. Corning asserts that from 2012 to 2018, Layne was the only company that performed work on the cooling tower pumps and that Corning's employees did not work on the pumps during that time. *See* Dkt. No. 65-15 at ¶ 6. Plaintiff objects by stating that Corning employees would visit the pump rooms to check for leaks, oil components of the pump, and check the rooms prior to Layne employees' visits. *See* Dkt. No. 74-3 at ¶ 2. Layne agrees with Corning's assertion to the extent that Layne employees were the only individuals working on the cooling tower pumps between 2012 and 2018, but notes that they were not the only people present in the pump houses. *See* Dkt. No. 73 at ¶ 6.

In 2013, Layne's Superintendent, Arthur Reinheimer, visited Corning to assess the configuration of the pumps and to create a work proposal. *See* Dkt. No. 74-2 at ¶ 9. Plaintiff asserts that one part of this assessment included measuring the distance between the pump and the I-beam "to make sure there was enough space to pull the pump apart in sections using the hoist."

4

*Id.* Layne objects because, although Reinheimer did visit Corning in 2013, Reinheimer only testified that he "might" have measured the I-beam. Dkt. No. 80-1 at ¶ 9. The parties agree that Reinheimer testified that the only purpose of the I-beam was to provide support for a chain hoist which was to be used to lift the pumps from the ground. *See* Dkt. No. 74-2 at ¶ 10. Reinheimer also testified that he could not remember "seeing an open-ended beam at any other customer's facility other than this Corning plant." *Id.* The purpose of the open-ended I-beam was to allow easy installation and removal of the chain hoist. *See* Dkt. No. 74-2 at ¶ 16.

Reinheimer would communicate to Layne employees how best to perform a specific job and any instructions or guidance concerning a job would come from him. *See* Dkt. No. 66-3 at ¶ 7; Dkt. No. 73 at ¶ 7. Layne also determined which tools and equipment were necessary to complete a job. *See* Dkt. No. 73 at ¶ 8. Layne admits this contention "except to the extent that the subject Chain Hoist was owned by Corning." Dkt. No. 73 at ¶ 8. Layne supplied its employees with personal protective equipment. *See* Dkt. No. 65-15 at ¶ 9; Dkt. No. 66-3 at ¶ 9.

Corning and Layne agree on the following process for inspecting each pump: a chain hoist would be used to remove the motor which needed to be removed, and then a chain hoist would be used to lift each pump. *See* Dkt. No. 65-15 at ¶ 11. Prior to 2018, there was no permanent chain hoist or end stop in either of the two pump rooms. *See id.* at ¶ 12. Thus, prior to 2018, Layne employees would bring their own chain fall to Corning and hang the chain hoist from an I-beam that was located in each pump house. *See id.* at ¶ 13. In the south pump house, the I-beam did not run the full length of the room but stopped two-to-three feet past the motor. *See id.* Corning asserts that Layne employees would place a vice grip or clamp on the I-beam to act as a temporary end stop for the chain hoist trolley because there was no permanent end stop on the I-beam. *See id.* at ¶ 14. Layne points to Tripp's testimony, in which he stated that there were

occasions when he would arrive at Corning and the clamps were already in place.  *See* Dkt. No. 73 at ¶ 14.

Plaintiff describes the work that had to be performed prior to lifting the pump as follows: they had to get the columns and shafts out of the pump, lift the motor out of the pump, lift the pump head off, break the shafts, take off the bonnet, take the adjusting nut off, take care of the clutch, get the chain falls over the motor, unbolt the motor, start pulling out pump components, and unfasten bolts for the motor clutch and motorhead.  *See* Dkt. No. 74-2 at ¶¶ 48-50.  Corning objects to this recantation because "Mr. Tripp, who performed the annual work on numerous occasions, described the process differently."  Dkt. No. 81-1 at ¶¶ 48-50.

Plaintiff states that "[t]he hoist was needed to move the motor which weighed hundreds of pounds as well as the pump which weighed between 500-600 pounds."  Dkt. No. 74-2 at ¶ 12.  He contends that there was a chain hoist in place at the time of Reinheimer's first visit.  *See id.* at ¶ 11.  Corning and Layne note that Reinheimer testified that he could not remember if there was a chain hoist in place on his first visit.  *See* Dkt. No. 81-1 at ¶ 11; Dkt. No. 80-1 at ¶ 11.  Corning adds that Reinheimer testified to Layne employees bringing their own chain fall to Corning in 2016 which meant that "if [they] were taking a chain fall, [they] probably needed it."  Dkt. No. 81-1 at ¶ 11.  Richard Stewart, a Corning maintenance worker, testified that prior to 2016, Layne employees would hang their own chain hoist, but after Corning purchased its Chain Hoist in 2016, Layne employees would use Corning's Chain Hoist and move it between the two pump rooms. *See id.*

Corning and Layne agree that on March 2, 2016, Corning purchased one chain fall and trolley, combined to be a "Chain Hoist" for Layne's use.  Dkt. No. 65-15 at ¶ 15; Dkt. No. 81-1 at ¶ 32.  Prior to May 14, 2018, Corning did not permanently install the Chain Hoist and the Chain

6

Hoist was moved between the two pump houses. *See* Dkt. No. 65-15 at ¶ 16. Corning avers that if it had installed a permanent end stop, then it may have been more difficult to move the Chain Hoist between the two pump houses. *See id.* Layne disputes that moving the Chain Hoist would have become more difficult. *See* Dkt. No. 73 at ¶ 16. Once Corning purchased the Chain Hoist in 2016, Layne stopped bringing their own and used only the Chain Hoist provided by Corning. *See* Dkt. No. 65-15 at ¶ 17. Layne moved the Chain Hoist from one pump house to the other. *See id.* at ¶ 18; Dkt. No. 66-3 at ¶¶ 15-16. Layne denies this to the extent that they did not move the Chain Hoist on the date of Plaintiff's accident. *See* Dkt. No. 73 at ¶ 18. Prior to May 14, 2018, neither Corning, nor any other contractors moved or used the Chain Hoist. *See* Dkt. No. 65-15 at ¶ 19. Layne admits this. *See* Dkt. No. 73 at ¶ 19.

Plaintiff disagrees. Plaintiff contends that prior to 2018, there was a separate chain hoist in each of the two cooling towers, so it was not necessary to carry it between the two pump houses. *See* Dkt. No. 74-3 at ¶¶ 9, 11. Plaintiff subsequently agreed that Tripp testified that Tripp stopped bringing Layne's chain hoist to Corning after Corning purchased its own. *See id.* at ¶ 10.

Plaintiff reiterates Reinheimer's testimony that at some point prior to Plaintiff's accident, there were two chain hoists, one for each pump room. *See* Dkt. No. 74-2 at ¶ 32; *see also* Dkt. No. 65-11 at 34; Dkt. No. 65-11 at 33-34. Tripp also testified that the second time he went to Corning, there was one chain fall in each pump room. *See* Dkt. No. 65-9 at 39. Layne admits "that a second chain hoist was ultimately purchased." Dkt. No. 80-1 at ¶ 32. Plaintiff references a purchase order ("PO") dated March 12, 2016, as evidence of a second hoist being purchased. *See* Dkt. No. 74-2 at ¶ 33. Corning contends that the PO concerns the first and only chain hoist purchased by Corning. *See* Dkt. No. 81-1 at ¶ 33. Plaintiff stated that Stewart was involved in "purchasing the second hoist at some point in time." Dkt. No. 74-2 at ¶ 33. In his testimony,

Stewart agreed that he had a role in procuring a trolley and chain fall so that Layne would not have to travel with their own. *See* Dkt. No. 65-10 at 31-33. Plaintiff's counsel specifically asked Stewart if "at any point [] a second trolley and chain fall [were] purchased to become assigned to each building?" *Id.* at 37. Stewart responded, "Not at my time. I left in December of 2018. I – I'm not sure." *Id.* at 38. Of note, Stewart visited the pump buildings, daily, to check for leaks. *See* Dkt. No. 74-2 at ¶ 105.

Plaintiff contends that Corning's Facility Manager, Brian Martinec, testified that "there are no other open-ended beams in the plant." Dkt. No. 74-2 at ¶ 17. However, as Corning clarifies in its objections, Martinec actually testified that he did not know if there were any other open-ended beams in the plant. *See* Dkt. No. 81-1 at ¶ 17;[3] *see also* Dkt. No. 76-2 at 109. Martinec also testified that he did not know if temporary stops were used in a similar manner with any other hoists. *See* Dkt. No. 76-2 at 109-10.

Citing to Corning Maintenance Supervisor Walter VanCise's testimony, Plaintiff asserts that Kevin McCann, a Corning facility engineer, inspected the pumphouses prior to hiring Layne and that McCann was responsible for hiring all of the contractors. *See* Dkt. No. 74-2 at ¶ 18. Corning objects and states that "Mr. VanCise did not testify that Mr. McCann would inspect the pumphouses prior to Layne doing its work. . . . Nor did Mr. VanCise testify that Mr. McCann usually inspected the sites of work before contractor arrived." Dkt. No. 81-1 at ¶ 18.

During VanCise's deposition, he was asked whether "it was part of [McCann's] responsibility to inspect the area where work was going to be done by outside contractors before they would do their work?" Dkt. No. 75-2 at 111. He responded, "Yes." *Id.* During McCann's

---

[3] Corning's objection states that "Mr. Martinec testified that he *did* know if there are other open-ended beams at Corning's diesel plant." Dkt. No. 81-1 at ¶ 17 (emphasis added). The Court believes this was a scriveners error based on the reading of the deposition transcript.

deposition, he was asked, "But short of disassembling the trolly and the hoist, are there any other trolley hoist systems at the Corning plant that are capable of coming off the end of a track or a beam?" Dkt. No. 65-7 at 80. McCann responded, "I – without disassembling it, I would have to say no." *Id.* Corning objects to Plaintiff's reliance on this testimony insofar as it "insinuates that temporary stops were never used in connection with chain hoists at the Diesel Plant." Dkt. No. 81-1 at ¶ 19.

The parties do agree that McCann was responsible for making sure the equipment was turned off so that work could be done and that Corning electricians were needed to unhook the motors from the pumps. *See* Dkt. No. 74-2 at ¶ 20. Corning employees also had to unhook the electrical portions of the pumps before Layne employees could do their work. *See id.* at ¶ 21. "Corning employees would come and check on Layne workers several times a day to see if anything was needed." *Id.*

Plaintiff attests that servicing the pumps took a minimum of two and a half days of work at Corning. *See* Dkt. No. 74-2 at ¶ 22. Plaintiff stated that "[t]ypically for annual maintenance of the pumps, you would not need to pull the pump, therefore, the fact that the pumps were being pulled on this occasion was a more detailed type of work." *Id.* Corning and Layne disagree. Layne states that the work Plaintiff and Tripp performed was the same work that was performed on an annual basis, which required pulling the pumps. *See* Dkt. No. 80-1 at ¶ 22. Corning and Plaintiff disagree about the characterization of Crook's testimony. *See* Dkt. No. 81-1 at ¶ 22. Crook testified that he did not know the specifics of how Plaintiff and Tripp's work was completed. *See* Dkt. No. 65-8 at 128. Crook was "trying to . . . remember why we would have used a chain hoist to pull these if it was more of just an inspection and test. Maybe if like we did a visual inspection. I don't know for sure." *Id.* Crook said that he would defer to someone else

about what was specifically being done in this instance "because its probably different, but generally it's like a maintenance, we're not pulling the pump." *Id.* at 129.

Corning notes that Stewart testified that preventative maintenance required that Layne employees to pull the pumps to look for wear on items and parts and that Plaintiff also testified that they needed to pull the pumps to be inspected. *See* Dkt. No. 81-1 at ¶ 22; *see also* Dkt. No. 64-4 at 96-97. Corning also quotes its PO to Layne which provided that Layne "will [p]ull each [p]ump, [i]nspect and reinstall." See Dkt. No. 81-1 at ¶ 22 (quotation omitted).

Plaintiff states that during "early visits" there was extensive calcium buildup on the pumps that required Layne employees to disassemble the pumps and take them back to Layne's facility. *See* Dkt. No. 74-2 at ¶ 23. Corning objects and notes that Layne was occasionally hired to address specific issues with the pumps. *See* Dkt. No. 81-1 at ¶ 23. Corning clarifies that on the date Plaintiff was at Corning, "Layne was hired to perform annual maintenance only and not to address issues with the pumps." *Id.*

In 2018, Layne agreed to perform its yearly maintenance on Corning's cooling tower pumps. *See* Dkt. No. 65-15 at ¶ 20; *see also* Dkt. No. 66-3 at ¶¶ 26-33 Corning issued a PO to Layne for the maintenance work on or about May 4, 2018. *See* Dkt. No. 65-15 at ¶ 21. The PO provides as follows:

> This PO is to have Layne come in and do our Annual Pm on our Three Facility Cooling Tower Pumps. They will [p]ull each [p]ump, [i]nsp[]ect, and reinstall. If there [are] any wear parts that need to be replaced that will be a separate charge. We have some spare [p]arts on [h]and. I would think that they should be in decent [s]hape at this time.

*Id.*; *see also* Dkt. No. 66-3 at ¶ 21. "Pm" referred to "preventative maintenance." Dkt. No. 65-15 at ¶ 21. The PO also incorporated by reference Corning's Terms and Conditions which contain an indemnification clause. *See id.* at ¶ 22. The indemnification clause states as follows:

> Seller will defend, indemnify and hold harmless Buyer and its officers, directors, employees, and affiliates from and against any and all costs (including reasonable attorneys' fees incurred), expenses, damages, liabilities, penalties, personal injuries or judgments suffered or incurred by any individual or to any real or personal property attributable to the Products, their use or to Seller's actions or omissions.

*Id.* The PO and Terms and Conditions required Layne to maintain insurance coverage and name Corning as an "additional insured." *Id.* at ¶ 23. The PO and Terms and Conditions constitute the parties' entire agreement concerning the work performed during the week of Plaintiff's accident—May 14, 2018. *See id.* at ¶ 24; *see also* Dkt. No. 66-3 at ¶ 24.

Stewart presented the PO from Corning to Layne employees on May 14, 2018. *See* Dkt. No. 74-2 at ¶ 36. Reinheimer was the field Superintendent at the time and was responsible for setting up jobs. *See id.* at ¶ 37. "Reinheimer would usually figure out what equipment was needed for a specific job, [and] he would give a load list to [Tripp]." *Id.* at ¶ 38. Plaintiff notes that if Layne brought its own chain hoist to Corning, it would have been included on a spread sheet provided by Reinheimer. *See id.* Plaintiff states that Reinheimer's review of past spreadsheets did not reveal that any hoists were listed. *See id.* Corning objects, stating that Reinheimer did not testify that he reviewed all prior spreadsheets, but he did testify that Layne loaded a slip chain fall when Layne performed work on the pumps in May 2016. *See* Dkt. No. 81-1 at ¶ 38.

During his first deposition session, Reinheimer testified that he would communicate verbally with Layne employees what tools the employees would need for a specific job. *See* Dkt.

No. 65-11 at 31-32.  If there "was something really out of the ordinary," he would list the equipment on a spreadsheet.  *Id.* at 31.  He testified that when he reviewed some of the spreadsheets, he did not see any equipment listed for going to the diesel plant and did not remember verbally discussing the need for a trolley or hoist.  *See id.* at 32.  In his second session, he testified that a chain hoist would have been equipment "out of the ordinary."  Dkt. No. 65-12 at 17.  He later explained that Layne "brought our own [chain fall] the first couple times we went there, and they [Corning] had purchased one and had put it up.  So, yeah, we did bring our own." *Id.* at 24.

Tripp had worked for Layne since approximately 2013 and had been to Corning five or six times prior to the date of the accident.  *See* Dkt. No. 74-2 at ¶ 29.  Usually, Layne employees used cranes to do their lifting, but Tripp was told on his first visit to Corning that a chain hoist on an I-beam would have to be used because the pumps were inside of a building.  *See id.*  Tripp noticed on his first visit to Corning that there was an open-ended beam and thought it was unusual because usually I-beams go wall-to-wall.  *See id.* at ¶ 30.

Plaintiff contends that Tripp testified that there was a chain hoist in place on his first visit and that he never brought a Layne chain hoist back to the facility.  *See id.*  Corning avers that Tripp testified that he could not remember whether he used a Corning or Layne chain fall on any given date or whether there was already a chain fall hanging from the I-beam when he arrived. *See* Dkt. No. 81-1 at ¶ 30.  Corning also reiterates Tripp's testimony which confirmed that in 2016, Layne reports indicated that Layne took a chain fall to Corning.  *See id.*; *see also* Dkt. No. 65-9 at 77-78.  Reinheimer and Stewart agreed in their depositions that Layne would take a chain fall to Corning.  *See* Dkt. No. 81-1 at ¶ 30; *see also* Dkt. No. 65-12 at 34-35; Dkt. No. 65-10 at 33.

As to Plaintiff, he would usually hear about his jobs either by e-mail on Sunday night or Monday morning when he reported to work. *See* Dkt. No. 74-2 at ¶ 40. The information would come from Reinheimer. *See id.* The date of Plaintiff's accident was the first time he had ever been to Corning's facility. *See id.* Plaintiff thought the job would likely take most of the week. *See id.* at ¶ 41. He did not receive any special training for the job. *See id.* Plaintiff contends that he "did not load up a chain hoist for this job because they were already on site. He knew this because [Tripp] had been there before and said we didn't need one." *Id.* The only safety equipment he was instructed to take was his normal personal protection equipment. *See id.* Plaintiff did not have any discussion with Tripp about the job and he planned to be working "as a helper" for Tripp. *See id.* at ¶ 42. When they arrived at Corning, Tripp called the maintenance department and they drove back to the pump houses. *See id.*

Layne usually separated the drill crews from the pump crews, and crews were usually made up of two-to-three people. *See* Dkt. No. 74-2 at ¶ 44. Plaintiff was a specialized driller. *See id.* Plaintiff "very seldom worked with pump crews." *Id.* Tripp had his pump installation license. *See* Dkt. No. 74-2 at ¶ 46. Plaintiff did not have a pumping license and was assisting Tripp on this job. *See* Dkt. No. 74-2 at ¶ 46.

On May 14, 2018, Reinheimer assigned Plaintiff and Tripp to perform the contracted work with Corning. *See* Dkt. No. 65-15 at ¶¶ 25-26; *see also* Dkt. No. 66-3 at ¶¶ 25-26. Before Plaintiff and Tripp arrived at Corning, Stewart walked through the pump rooms and did not notice whether the Chain Hoist was hanging or whether there was an end stop on the I-beam. *See id.* at ¶ 27. Plaintiff and Trip arrived at Corning and met with Stewart. *See id.* at ¶ 28; Dkt. No. 74-2 at ¶ 24. Stewart, Plaintiff, and Tripp entered the south pump house. Plaintiff did not have any conversations with Stewart about maintenance. *See id.* at ¶ 29. Stewart was not in the room

while the work was being performed, nor was any other Corning employee or representative.  *See id.* at ¶ 30.  Tripp was in charge.  *See id.* at ¶ 31.  The scope of the work Tripp and Plaintiff were to perform consisted of pulling all three pumps out of the ground, taking them apart, inspecting them, clearing any calcium from them, reassembling them, and putting them back into the ground.  *See id.* at ¶ 32.  The scope of the work did not include any repairs and if additional work was needed, a separate PO would be executed.  *See id.*

Concerning the I-beam and Chain Hoist at issue, Plaintiff states that "[a]t the time he sent Mr. Tripp and [Plaintiff] to the Corning facility[,] Reinheimer assumed that there was a hoist and an end stop on the opened beam in place."  Dkt. No. 74-2 at ¶ 39.  Corning and Layne object to Plaintiff's statement as a mischaracterization of Reinheimer's testimony.  *See* Dkt. No. 81-1 at ¶ 39; Dkt. No. 80-1 at ¶ 39.

During Reinheimer's deposition, Plaintiff's counsel asked, "what sort of end stop on that I-beam would you consider to be acceptable?"  Dkt. No. 65-12 at 16.  Reinheimer stated, "[g]enerally[,] they will have a welded tab so that it can't come off.  Or times when we put our own on, we've made our own stop out of vice grips or a clamp or anything just to keep that trolley from coming off."  *Id.*  Plaintiff's counsel asked whether Reinheimer had "ever seen that type of setup before where there was an open ended beam placed in a building of that nature solely for lifting purposes."  *Id.* at 57.  Reinheimer responded, "[t]hat I can't answer because I don't recall.  I mean I've looked at a lot of different beams and different setups for chain falls."  *Id.* at 58.  He was asked whether he recalled "ever seeing one that had an open ended beam, other than this one at the Corning plant where [Plaintiff] got injured?"  *Id.*  He responded, "[n]o, I don't recall."  *Id.*  Plaintiff's counsel also asked, "[a]nd the chain fall that was either purchased or put there, put there by Corning, was it your understanding that they would also be putting a stop on that beam as well

14

on the end?" *Id.* at 60-61.  Reinheimer stated that it is "the right thing to do. . . . Well, generally if you have an open ended beam, you would put a stop on it just to not have something like this happen again, you know." *Id.* at 61.

In his response to Corning's statement of material facts, Plaintiff contends that "there may never have been on a stop on the open-ended beams." Dkt. No. 74-3 at ¶ 8.  To support this assertion, Plaintiff cites Martinec's testimony.  *See id.*  The cited transcript portions indicate that Martinec was the facilities and maintenance manager at the diesel manufacturing facility on May 14, 2018, and that he did not know whether there was ever an end stop on the I-beam related to Plaintiff's accident, or whether there were any other I-beams like the one related to Plaintiff's accident located at the plant.  Dkt. No. 76-1 at 6, 42; Dkt. No. 76-2 at 81, 109.

When Plaintiff and Tripp had to lift the motor, they were the only two individuals in the room.  *See* Dkt. No. 74-2 at ¶ 51.  Plaintiff did not know that the I-beam did not go all the way to the wall and Tripp did not warn him.  *See id.* at ¶ 52.  Tripp did not observe that there was no end stop on the I-beam.  *See id.*

Plaintiff and Tripp first conducted their "lock out/tag out" procedure in which they put their locks and tags on the electrical box to ensure that the power was shut down before starting their job.  *See* Dkt. No. 65-15 at ¶ 33.  Although there were no Corning employees who stayed in the room with Tripp and Plaintiff, *see* Dkt. No. 66-3 at ¶ 30, a Corning employee was needed to turn off the electrical power to the pumps and disable them from the plant's cooling system.  *See* Dkt. No. 74-3 at ¶ 13.  Tripp then completed a Job Safety Analysis form which was required by Layne to be filled out by the "operator" or lead person assigned to a job.  *Id.* at ¶ 34.  Each person working at a job site was required to participate in the Analysis.  *See id.*  Plaintiff did not participate in the Analysis other than signing his name on the form because he was "getting tools

and stuff out" of the truck while Tripp filled out the form.  *Id.* at ¶ 35.  Layne employees were responsible for checking all equipment before use, including the Chain Hoist and I-beam.  *See* Dkt. No. 65-15 at ¶ 36.  Layne admits "that Layne's own policy directs employees to check equipment prior to use, but . . . denie[s] that this negates Corning's requirements to furnish safe equipment."  Dkt. No. 73 at ¶ 36.

Plaintiff states "[a]t some point he brought down the hoist but left the trolley on the I-beam. . . .  The accident happened on the first use of the hoist."  Dkt. No. 74-2 at ¶ 54.  However, Tripp inspected the Chain Hoist that was hanging from the I-beam in the south pump house and found that the chain was "squealing."  Dkt. No. 65-15 at ¶ 37.  Tripp climbed up a ladder to reach the I-beam, pulled out the pins and washers, and brought the Chain Hoist to the floor.  *See id.*  He lubricated the Chain Hoist with WD-40 and hung it back on the I-beam with Plaintiff's assistance. *See id.*  Neither Tripp nor Plaintiff inspected the I-beam to see if there was an end stop in place. *See id.* at ¶ 38.  The parties agree that the I-beam was approximately two-to-three feet to the outside of the motor and the pump was five-to-six feet away from the far wall.  *See* Dkt. No. 74-2 at ¶ 59.  Tripp testified that after lubricating the chain fall and hanging it back up, Tripp operated the chain fall to pick up and move the motor.  *See* Dkt. No. 65-9 at 98.  He then "brought the chain fall back over and hooked it up to pull the pump itself."  *Id.*  Plaintiff contends that prior to the accident, he and Tripp had been working on the pump for "for about an hour."  Dkt. No. 74-2 at ¶ 51.

Plaintiff does not object to Corning's statement that Plaintiff "was not looking up at the I-beam when he pulled the trolley off of the end of the I-beam. . . .  In fact, [Plaintiff] admits that he did not look at the I-beam at any time before pulling the chain.  He thought the I-beam ran the full length of the room."  Dkt. No. 66-3 at ¶ 42; *see also* Dkt. No. 74-3.  It is undisputed that there was

no end stop on the I-beam.  *See* Dkt. No. 66-3 at ¶ 39.  Plaintiff pulled the Chain Hoist causing it to come off the end of the I-beam.  *See id.*  Plaintiff testified that he believed that both he and Tripp grabbed the chain and that they wanted to move the chain over the top of the motor.  *See* Dkt. No. 74-2 at ¶ 57.  When they pulled it, the momentum of the chain fall made it come off the I-beam.  *See id.*  Plaintiff contends that "[w]hen *he* pulled the chain, the hoist came off the end and right down onto his head."  *Id.* at ¶ 58 (emphasis added).  He states that both the hoist and trolley fell off the beam and that "[h]e did not pull the hoist beyond the pump but the momentum of moving it made the trolley go beyond the pump towards the end."  *Id.*

Corning and Layne object to Plaintiff's characterization of the incident.  Layne cites to Tripp's deposition testimony in which Tripp stated that Plaintiff "yanked" the Chain Hoist from Tripp's hands which caused it to fall.  *See* Dkt. No. 80-1 at ¶¶ 57-58.  Corning states the same. *See* Dkt. No. 81-1 at ¶¶ 57-58.  Plaintiff does not object to Corning's statement of material facts that "[w]hile [Plaintiff's] and Tripp's versions of events differ markedly, they both agree that [Plaintiff] pulled on the Chain Hoist, causing it to come off the end of the I-beam. . . .  There was no end stop on the I-beam at the time."  Dkt. No. 66-3 at ¶ 39; *see also* Dkt. No. 74-3.  Insofar as Corning asserts that neither Tripp nor Plaintiff inspected the I-beam prior to beginning their work, *see* Dkt. No. 66-3 at ¶ 38, Plaintiff objects "to the extent that it suggests that [Plaintiff] had any personal knowledge that the I-beam upon which the chain hoist was hung, did not run to the wall or require any type of end stop to prevent it from coming off the I-beam.  The proof in this case is that [Plaintiff] did not know until after the accident that the I-beam was open ended and that Mr. Tripp testified that he never warned him of this fact."  Dkt. No. 74-3 at ¶ 15.

The Chain Hoist hit Plaintiff's hard hat, fell to his shoulder, and then fell to the ground. *See* Dkt. No. 65-15 at ¶ 43.  Tripp asked Plaintiff if Plaintiff needed medical attention and

Plaintiff declined. *See id.* at ¶ 44.  Tripp asked Plaintiff if Plaintiff could continue working and Plaintiff stated that he could.  *See id.*  Tripp put the Chain Hoist back on the I-beam and Tripp obtained materials from his truck to act as an end stop.  *See id.* at ¶ 45.  After placing an end stop on the I-beam, Plaintiff and Tripp inspected the pump, disassembled it, cleaned it, and put it back together.  *See id.* at ¶ 46.  Corning asserts that there were suitable ends stops available because Layne employees kept vice grips or "clamps" in their trucks as "tools of the trade." *Id.* at ¶ 41.  Layne agrees that "Layne employees keep vice grips in their vehicles."  Dkt. No. 73 at ¶ 41.  Plaintiff does not object to Corning's statement that after the accident, Tripp "retrieved materials from his truck to act as a stop at the end of the I-beam." Dkt. No. 66-3 at ¶ 46

Plaintiff went to the truck to collect himself and he told Tripp that they should inform the Corning safety team.  *See* Dkt. No. 74-2 at ¶ 60.  Plaintiff states that "Corning safety people were contacted and came out to the site after the accident." *Id.*  Plaintiff "believes that [Tripp] looked up in Google the weight of the trolley and it was 80[] pounds." *Id.*  Corning clarifies that Stewart was not notified of the incident until the following day.  *See* Dkt. No. 81-1 at ¶ 60.

Plaintiff notes that "[t]ypically, Corning would have parts on site which would be installed as needed." Dkt. No. 74-2 at ¶ 25.  Plaintiff specified that the parts would usually be kept in the pump house with two pumps and that Corning's PO stated that Corning had some spare parts on hand.  *See id.*  Corning objects "to the extent that Plaintiff claims that parts were always replaced as part of annual preventative maintenance." Dkt. No. 81-1 at ¶ 25.  Corning reiterates that if additional work was needed, a new PO would have been created.  *See id.*  Corning also notes that the "installer's report" for work performed in May 2018 reflected that one of the pumps needed

"bowl bushings, wear rings, oversized stuffing box or new pump," but that Plaintiff and Tripp did not replace those parts. *Id.*[4]

While Plaintiff and Tripp were working, if additional parts were necessary, Tripp communicated with Reinheimer about it, and Reinheimer would order and get the new parts. *See* Dkt. No. 74-2 at ¶ 26. Tripp testified that he was not sure but believed that he and Plaintiff may have replaced a shaft at the time of their visit. *See id.* at ¶ 27.

Plaintiff recounts VanCise's testimony as stating that Corning employees needed to have access to the pumps to lubricate the various components. *See id.* at ¶ 28. Corning views the testimony in a different light, contending that VanCise testified that he was not certain but believed that Corning employees would lubricate the motor attached to the pump. *See* Dkt. No. 81-1 at ¶ 28. Corning also reiterates Stewart's testimony that Corning employees never used the Chain Hoist in the pump rooms for any purpose. *See id.*

Plaintiff asserts that because of the amount of water being pumped, the components of the pumps would wear out. *See* Dkt. No. 74-2 at ¶ 14. Plaintiff states that "[m]ostly the shafts and bearings would be replaced each visit because of the calcium buildup." *Id.* Corning disagrees by noting that there is no evidence as to whether a shaft or bearing was replaced in May 2018 because there was no PO for those parts, nor did Corning call Layne to address those parts. *See* Dkt. No. 81-1 at ¶ 14. The parties provide the PO which notes "inspection and service annual Pm for Facility Cooling Tower Pumps." Dkt. No. 74-9 at 2. The PO does not contain any items for repair. *See id.* Corning notes that Tripp did testify that the "pumps had the same parts that would go wrong every time. Mostly it was a shaft and the bearings . . . ." *Id.* However, Corning

---

[4] Throughout the depositions, there are questions and answers concerning an "installer report." *See, e.g.*, Dkt. No. 65-15 at ¶ 51. It does not appear that the parties attached the report to any of their filings.

contends that Plaintiff did not remember if they replaced a shaft in May 2018 and admitted that they were inspecting the pumps, not making changes or repairs.  *See id.*

Plaintiff disagrees, stating that "[t]here is also proof in this case, that a pump shaft was replaced, along with packing and bushings."  Dkt. No. 74-3 at ¶¶ 14, 19.  Plaintiff relies on his and Tripp's deposition testimony to support this contention.  *See id.*  During Tripp's deposition, he testified that "[t]he time with [Plaintiff], the incident with [Plaintiff], we were able to basically just change their shafts out and get it operable, and so they never came back.  The only thing that came back was a wore out shaft to be reordered."  Dkt. No. 65-9 at 35.  He later explained that as part of the equipment taken to Corning, he "probably" took "a shaft because we almost always end up bringing one of the pumps shafts with us."  *Id.* at 87.  Tripp testified that he could not "specifically remember" or "tell you for sure" if parts replaced.  *Id.* at 164.

Plaintiff stated during his deposition that he and Tripp "may have replaced a shaft.  I'm not a hundred percent sure, but that's a lot of the problem is the shaft . . . .  I'm not sure if we replaced the mechanical seal.  They may have had that on site."  Dkt. No. 64-4 at 101.  Plaintiff was asked, "other than possibly the mechanical seal or the shaft, do you recall working on any other specific parts?"  *Id.* at 103.  Plaintiff responded, "I'm – don't recall if we put new bushings in it, rubber – rubber bushings.  I – like I said, I – they had some stuff there and like if it was in good shape, we would used it."  *Id.*  Plaintiff later reiterated that they reassembled the pump and was not "a hundred percent sure if Art brought us a shaft or I don't recall."  *Id.* at 157.

Plaintiff states that Layne would either refurbish the pumps on site or take them back to Layne's shop depending on their condition.  *See* Dkt. No. 74-2 at ¶ 15.  Corning clarifies that if the work was annual preventative maintenance, then the pumps were not refurbished on site or taken to Layne's shop.  *See* Dkt. No. 81-1 at ¶ 15.  If the work was routine preventative

maintenance,  Layne would inspect the pumps and if additional work was needed, a new PO was created.  *See id.*

The next day, Plaintiff and Tripp returned to Corning.  *See* Dkt. No. 74-2 at ¶ 47.  Jean Himel, a member of Layne's Safety Department, met with Plaintiff to discuss his injuries.  *See* Dkt. No. 66-3 at ¶ 48; *see also* Dkt. No. 65-15 at ¶ 48.  Plaintiff and Tripp acknowledged that they did not realize there was no end stop on the I-beam and Tripp agreed that the two of them "screwed up" by not checking.  Dkt. No. 66-3 at ¶ 48.  Himel concluded that Plaintiff "and Tripp '[s]how[ed] a lack of proper pre-job hazard assessment and complacency in not only checking our equipment, but also checking the client's equipment before we use it.'"  *Id.* at ¶ 49 (quotation omitted).  Plaintiff objects to Corning's reliance on these statements insofar as "it ignores post-accident investigation conducted by Corning which placed the blame for the events on Corning."  Dkt. No. 74-3 at ¶ 18.  Plaintiff does not, however, deny Himel's conclusion or Tripp's statement.  *See id.*

Plaintiff states that "[a]fter the accident[,] the Corning safety people came out to the site and inquired why the beam did not dead end into the wall. . . .  After post-accident discussions it was clear that the hoist was Corning's and therefore the responsibility of putting a clamp would have been theirs as well.  After the accident the Corning people came out and confirmed that the chain fall was theirs."  Dkt. No. 74-2 at ¶ 62.  Corning and Layne object.  Layne admits that Corning owned the Chain Hoist but disagrees that the fact of ownership alone creates any responsibility.  *See* Dkt. No. 80-1 at ¶ 62.  Crook testified that he believed that Corning installed the Chain Hoist, but Corning states that there is no record evidence to support that contention.  *See* Dkt. No. 81-1 at ¶ 62.  Corning contends that the Chain Hoist was likely installed during Layne's prior visit because Stewart testified that Corning employees never used the Chain Hoist.

*See id.*  Additionally, Corning relies on Stewart's testimony to support the contention that Layne used a c-clamp to secure the end stop prior to May 2018 and that there is no evidence that Corning ever removed the clamp.  *See id.*; *see also* Dkt. No. 65-10 at 52, 83.  Corning also reiterates Reinheimer's testimony that he expects Layne employees to check for end stops and Crook's testimony that it would be foolish not to put a stop on the end of something being worked on.  *See* Dkt. No. 81-1 at ¶ 62.

Corning relies on Tripp's and Stewart's testimony that they had seen end stops on the I-beam in previous years when Layne was working, *see* Dkt. No. 66-3 at ¶ 40, and Plaintiff relies on Martinec's testimony that he did not believe there was an end stop on the I-beam before 2018.  *See* Dkt. No. 74-3 at ¶ 16.  However, Martinec did not testify that Corning did not have end stops on the I-beams before 2018; he testified that he did not know.  *See* Dkt. No. 76-2 at 81, 109.

Plaintiff states that after the safety personnel visited, Plaintiff and Tripp inspected, cleaned, and reassembled the pumps.  *See* Dkt. No. 74-2 at ¶ 63.  The pumps are usually moved on a cart to outside of the building to be worked on and that the motor is placed on cribbing.  *See id.* at ¶ 64.

Plaintiff states that they replaced a shaft and were able to "get the pump operational."  Dkt. No. 74-2 at ¶ 65.  Corning objects and states that there were no problems with the pump and neither Tripp nor Plaintiff could remember if they replaced a shaft.  *See* Dkt. No. 81-1 at ¶ 65.  They did reassemble the pump the next day.  *See* Dkt. No. 74-2 at ¶ 65.  Plaintiff could not recall but thought that Reinheimer might have brought a shaft to replace the one in the pump.  *See id.*

Plaintiff asserts that Corning put a clamp on the I-beam a couple of days after the accident. *See* Dkt. No. 74-2 at ¶ 67.  Corning objects to clarify that immediately after the accident, Tripp retrieved a vice grip from his truck and put it on the end of the I-beam.  *See* Dkt. No. 81-1 at ¶ 67.

Plaintiff testified that the project took four days to complete, but Corning contends that based on an installer's report, it took three days. *See* Dkt. No. 75-2 at ¶ 68; Dkt. No. 81-1 at ¶ 68. Plaintiff notes that "he did not bring any device suggesting that in that statement he knew that the beam did not run to the wall." Dkt. No. 74-3 at ¶ 17.

When Plaintiff and Tripp went to the second pump room, Plaintiff contends that there was a second hoist in place. *See* Dkt. No. 74-2 at ¶¶ 69-70. Corning cites Tripp's testimony which was that he believed there was a chain hoist hanging when they arrived at the second room, but that Stewart testified that there was only one chain hoist that was moved from room to room. *See* Dkt. No. 81-1 at ¶¶ 69-70.

Plaintiff reiterates the installer's report which noted that pump 303 needed bushing replacements and a shaft and recommended a new pump. *See* Dkt. No. 74-2 at ¶ 71. Layne admits that is what the report stated, but notes that such parts are "typically fixed during a subsequent visit." Dkt. No. 80-1 at ¶ 71. Plaintiff states in his statement of material facts that Plaintiff and Tripp replaced a shaft and mechanical seals. *See* Dkt. No. 74-2 at ¶ 72. Layne and Corning assert that Plaintiff did not remember during his deposition whether any parts were replaced, and neither could Tripp. *See* Dkt. No. 80-1 at ¶ 72; Dkt. No. 81-1 at ¶ 72. Corning also notes that the Installer's Report does not list any replacements. *See* Dkt. No. 81-1 at ¶ 72. Reinheimer did not think there was a need to replace the shaft but recommended new bushings and a new pump, which was confirmed in the Installer's Report. *See* Dkt. No. 74-2 at ¶ 73.

Reinheimer visited the site the day after the accident and either he or Tripp took photographs of the area. *See* Dkt. No. 74-2 at ¶ 75. Dusseault, from Corning's Safety Department, learned of the accident on May 15, 2018, and was tasked with investigating it. *See id.* at ¶ 76.

23

Corning's response team investigated the accident and filled out a Global Security

Operations Center form.  *See* Dkt. No. 74-2 at ¶ 77; Dkt. No. 65-6 at 43.  Corning also prepared a

Matrix (PEAR) to provide information about the type of incident and level of response by

Corning.  *See id.* at ¶ 78.  The (PEAR) was created by the Facility and Maintenance Department

and the Environmental Health and Safety Department.  *See id.* at ¶ 79.  The purpose of the

document was to state the root and continuing causes of the incident and was submitted to

Dusseault for review.  *See id.* at ¶ 80.  The document listed corrective or preventative measures

that could have prevented the accident from occurring such as installing a temporary or permanent

end stop; informing the contractor of the importance of situational awareness; evaluating similar

I-beams in the plant; adding a hoist; and installing an appropriate lift capacity label on the I-beam.

*See id.* at ¶ 81.  VanCise conducted a "5Why" Investigation.  *See id.* at ¶ 82.

VanCise was the maintenance supervisor at the plant for seven years, including in 2018.

*See id.* at ¶ 83.  He oversaw the 5Why Investigation.  *See id.* at ¶ 84.  Prior to the accident in this

case, he conducted approximately fifty investigations, some of which included outside

contractors.  *See id.* at ¶ 85.  The purpose of the 5Why Investigation was to determine the root

cause of the incident and eliminate hazards.  *See id.* at ¶¶ 86-87.  He took photographs for the

investigation and inspected the area where the accident occurred.  *See id.* at ¶¶ 86-88.

Plaintiff relies on the report's results to the extent it noted that the only corrective action

needed to be taken by a contractor was to replace his hardhat.  *See id.* at ¶ 92.  Layne admits "that

this information was identified in the 5Why report, but den[ies] that these are the sole factors of

[Plaintiff's] negligence."  Dkt. No. 80-1 at ¶ 92.  Corning contends that "the incident report did not

state that the only steps needed to be taken by Layne was a more appropriate hardhat. . . .  The

incident report states that a hardhat needed to be replaced as a 'corrective action.' . . .  There is no

evidence that the hardhat [Plaintiff] was wearing was not 'appropriate.'  Instead, it needed to be replaced after accident."  Dkt. No. 81-1 at ¶ 92.  Corning also explained that because Plaintiff was not an employee of Corning, the Incident Report did not relate to him; rather, "[t]he purpose of the investigation is to identify controls that Corning can put into place" so that such an accident might be less likely in the future.  *Id.*

Plaintiff notes that the EHS-Incident Report stated that Corning needed a permanent angle iron stop on the I-beam and that the I-beam needed to be added to inspection checklists.  *See* Dkt. No. 74-2 at ¶ 94.  Corning objects to this contention by reiterating the reason behind the report and that it focuses on Corning.  *See* Dkt. No. 81-1 at ¶ 94.

VanCise testified that there probably should have been an angle iron or bolt on the I-beam related to the accident.  *See* Dkt. No. 74-2 at ¶ 99.  VanCise testified that he conducted "5S" audits with other Corning employees to go through the various sections of the plant with a checklist.  He would perform this task approximately three times a year.  Dkt. No. 74-2 at ¶¶ 102-03.  Plaintiff states that the purpose of these audits "was to look for cleanliness and sustainability and check equipment."  *Id.* at ¶ 103.  Corning objects, stating that the purpose of the audits was also to check equipment.  *See* Dkt. No. 81-1 at ¶ 103.  Plaintiff contends that VanCise testified that it was necessary for Corning employees to sometimes work in the pump rooms.  *See* Dkt. No. 74-2 at ¶ 104.  Corning states that employees would sometimes lubricate the motor attached to a pump.  *See* Dkt. No. 81-1 at ¶ 104.

Plaintiff states in his statement of material facts that "[t]he hoist in question was owned by Corning."  Dkt. No. 74-2 at ¶ 106.  Corning and Layne admit this fact.  However, confusingly, in Plaintiff's objections to Corning's statement of material facts, Plaintiff states that "there is an issue of fact as to who owned the hoist."  Dkt. No. 74-3 at ¶ 7.

## DISCUSSION

### A.    Summary Judgment Standard

A court shall grant summary judgment when a moving party demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Doane v. United States*, 369 F. Supp. 3d 422, 438 (N.D.N.Y. 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("The entry of summary judgment is warranted when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law'")).  "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Jennings v. Decker*, 359 F. Supp. 3d 196, 204 (N.D.N.Y. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Doane*, 369 F. Supp. 3d at 438; *Kenney v. Clay*, 172 F. Supp. 3d 628, 635 (N.D.N.Y. 2016).

It is the duty of the jury to make "[a]ssessments of credibility and choices between conflicting version of the events . . . not . . . the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  However, irrelevant or unnecessary factual disputes do not preclude summary judgment.  *Anderson*, 477 U.S. at 248.  Only genuine disputes about a material fact, such that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" will preclude summary judgment.  *Id.*  The substantive law will determine the materiality of a fact.  *Id.*

The party moving for summary judgment "bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the

claim." *Doane*, 369 F. Supp. 3d at 438.  If the moving party establishes a prima facie basis for summary judgment and satisfies their burden, the burden then shifts to the nonmoving party, who must then "show, through affidavits or otherwise, that there is a material issue of fact for trial" that a reasonable jury could resolve in its favor.  *Id.*; *see also Kenny*, 172 F. Supp. 3d at 635. Evidence that is not significantly probative, or "the mere existence of some alleged factual dispute between the parties[,] will not defeat an otherwise properly supported motion for summary judgment."  *Kenny*, 172 F. Supp. 3d at 635-36 (quoting *Anderson*, 477 U.S. at 247-48); *see also Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) ("Genuine issues of fact are not created by conclusory allegations").  The nonmoving party must show by more than a "scintilla of evidence" that "a fact-finder could reasonably find for the non-movant."  *Heublein*, 996 F.2d at 1461.  In determining the existence of any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party."  *Smith v. N.Y.S. Off. of Temp. & Disability Assistance*, 535 F. Supp. 3d 90, 94 (N.D.N.Y. 2021) (quoting *Ward v. Stewart*, 286 F. Supp 3d 321, 327 (N.D.N.Y. 2017); *see also Jeffreys*, 426 F.3d at 553; *United States. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

**B.     Evidentiary Objections**

     Corning objects to Plaintiff's reliance on a post-accident investigation report in his statement of material facts as inadmissible on grounds that the report is evidence of a subsequent remedial measure and more prejudicial than probative.[5]  *See* Dkt. No. 81-1 at ¶¶ 77-82, 86-92.

---

[5] Corning also objects to one of Plaintiff's statements as inadmissible because it relies on hearsay within hearsay.  *See* Dkt. No. 81-1 at ¶ 60.  The Court declines to address this issue as the statement does not bear on any of the issues addressed in this decision; therefore, the Court does not reference the statement in this Memorandum-Decision and Order.

"On summary judgment, evidence used to raise an issue of fact must be admissible or contain evidence that will be presented in a form admissible at trial." *Ava Realty Ithaca, LLC v. Griffin*, No. 5:19-CV-123, 2021 WL 3848478, *5 (N.D.N.Y. Aug. 26, 2021) (citing *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001)).  "'[M]aterial relied on at summary judgment need not be admissible in the form presented to the district court.  Rather, so long as the evidence in question "will be presented in admissible form at trial," it may be considered at summary judgment.'" *Id.* (quoting *Smith v. City of New York*, 697 Fed. Appx. 88, 89 (2d Cir. 2017)).

"Rule 407 of the Federal Rules of Evidence . . . generally prohibits a plaintiff from introducing evidence of subsequent remedial measures taken by the defendant in order to establish the defendant's underlying liability." *Est. of Hamilton v. City of New York*, 627 F.3d 50, 53-54 (2d Cir. 2010), *superseded by regulation on other grounds as stated in Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108 (2d Cir. 2013) (citing *Lust v. Sealy, Inc.*, 383 F.3d 580, 585 (7th Cir. 2004) (observing that there is no reason to limit application of this rule to nonintentional torts)); *see also Zinz v. Empire City Subway Co.*, No. 13-CV-4415, 2014 WL 5293603, *3 (S.D.N.Y. Oct. 14, 2014) ("Although the post-accident photographs depict a subsequent remedial measure, normally barred by the Federal Rules of Evidence, the photographs are admissible as evidence that Empire controlled the area where Zinz fell").

However, "[p]ost-event tests or reports are generally outside the scope of Rule 407, and thus admissible, on the basis that they are conducted or prepared for the purpose of investigating the cause of the accident, and can rarely be characterized as 'measures' which, if conducted previously, would have reduced the likelihood of the accident." *M.T. v. City of New York*, 325 F. Supp. 3d 487, 498 (S.D.N.Y. 2018) (citing 2 Weinstein's Federal Evidence § 407.06(1) (2018)). "It is only if changes are implemented as a result of the tests that the goal of added safety is

furthered; and, even then, it is only evidence of those changes that is precluded by the rule." *Id.* (citation omitted); *Westmoreland v. CBS Inc.*, 601 F. Supp. 66, 67 (S.D.N.Y. 1984) ("The fact that subsequent remedial measures are excluded as admissions of fault does not mean that competent evidence resulting from an internal investigation of a mishap must also be excluded").  As to Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." FED. R. EVID. 403.

The fact that a permanent end stop was installed on the I-beam at issue after Plaintiff's accident is inadmissible evidence of a subsequent remedial measure.  However, a post-accident investigation report is not a subsequent remedial measure.  Insofar as Corning objects to the investigation report as substantially more prejudicial than probative, the Court disagrees.  *See* Dkt. No. 81-1 at ¶¶ 77-82, 86-92.  Although the report, concluding that Corning failed to take certain steps that may have prevented the accident, is prejudicial to Corning, it is not substantially more prejudicial than probative.  Thus, the Court will consider the report in determining whether there are any disputes of material fact.

## C.    Labor Law Section 240

Corning and Layne argue that summary judgment is warranted in their favor because Plaintiff was not engaged in work covered by New York Labor Law Section 240(1).  *See* Dkt. No. 64-2 at 5-8; Dkt. No. 66-2 at 4-11.  They argue that Plaintiff was engaged in "routine maintenance" at the time of the accident.  *See* Dkt. No. 64-2 at 7; Dkt. No. 66-2 at 9.  Plaintiff contends that an issue of fact exists as to whether the work he was engaged in was repairing, altering, or cleaning of a building or structure.  *See* Dkt. No. 74-1 at 12.[6]

---

[6] Plaintiff also argues that the industrial pumps in question are a "structure" for purposes of Section 240(1).  Dkt. No. 74-1 at 6.  Neither Corning nor Layne argues otherwise.  *See generally* Dkt. Nos. 64-2, 66-2.

New York Labor Law Section 240, known as the "scaffolding law," provides as follows:

> All contractors and owners and their agents . . . who contract for but
> do not direct or control the work, in the *erection, demolition,*
> *repairing, altering, painting, cleaning or pointing* of a building or
> structure shall furnish or erect, or cause to be furnished or erected
> for the performance of such labor, scaffolding, hoists, stays, ladders
> . . . and other devices which shall be so constructed, placed and
> operated as to give proper protection to a person so employed.

N.Y. Lab. L. § 240(1) (emphasis added).  This section "is to be construed as liberally as may be

for the accomplishment of the purpose for which it was thus framed."  *Rocovich v. Consolidated*

*Edison Co.*, 78 N.Y.2d 509, 513 (1991).  "However, '[t]he extraordinary protections of Labor Law

§ 240(1) extend only to a narrow class of special hazards, and do "not encompass any and all

perils that may be connected in some tangential way with the effects of gravity."'"  *Roberts v.*

*Globalfoundries, U.S., Inc.*, No. 1:13-CV-1169, 2015 WL 12942046, *3 (N.D.N.Y. Sept. 14,

2015) (quoting *Nieves v Five Boro A.C. & Refrig. Corp.*, 93 N.Y.2d 914, 915-916 (1999))

(additional quotation omitted).

The New York Court of Appeals has distinguished "repairing" from "routine

maintenance."  *Esposito v. N.Y.C. Indus. Dev. Agency*, 1 N.Y.3d 526, 528 (2003) ("[R]eplacing

components [of air conditioning units] that require replacement in the course of normal wear and

tear" constitutes routine maintenance); *Chizh v. Hillside Campus Meadows Assocs., LLC*, 3

N.Y.3d 664, 665 (2004) (concluding that replacing a torn window screen constitutes routine

maintenance); *Abbatiello v. Lancaster Studio Assocs.*, 3 N.Y.3d 46, 53 (2004) (determining that

draining water that accumulated in an exterior junction box was a common problem that

constituted routine maintenance and not a repair); *see also Prats v. Port Auth. of N.Y. & N.J.*, 315

F.3d 146, 148 (2nd Cir. 2002) ("Repairing requires proof that the machine or object being worked

upon was inoperable or not functioning properly prior to the work in question") (citation omitted).

The Second Circuit has highlighted this distinction by stating that "[w]hile § 240(1) refers to workers 'repairing' a structure, it does not use the terms 'maintaining' or 'maintenance.'" *Wilson v. City of New York*, 89 F.3d 32, 36-37 (2d Cir. 1996). The Second Circuit explained that "[i]n considering whether replacing parts of a building's equipment is work covered by § 240(1), the New York courts have distinguished between equipment which was functioning and that which was not. For example, an attempt to fix a sign that was 'operating improperly' constitutes a repair within the meaning of § 240(1)." *Id.* at 37 (collecting cases). The Second Circuit concluded that the district court properly granted summary judgment for the defendant where "the applicability of § 240(1) . . . turned on whether the equipment was functional or not, not on the degree of skill required in connection with the work to be performed. There was no genuine issue to be tried here as to the nature and purpose of [the plaintiff's] task." *Id.* The Second Circuit also explained that the plaintiff "admitted that Millar regularly replaced roller guides 'about every six months' and that that was part of routine maintenance, a 'normal thing that we do on the job.'" *Id.* Thus, "[i]t is undisputed that the elevator was functional . . ., that it had not been rendered nonfunctional by the worn roller guides, that it functioned until it was taken out of service for the purpose of replacing the roller guides, and that the replacement of the roller guides was intended merely to prevent malfunctioning of the elevator in the future." *Id.*; *see also Craft v. Clark Trading Corp.*, 357 A.D.2d 886, 887 (3d Dep't 1999) ("[T]he paramount issue becomes whether the item being worked on was inoperable or malfunctioning prior to the commencement of the work").

Layne asks the Court to conclude that the distinction between routine maintenance and repairs "depends upon whether the item being worked on was inoperable or malfunctioning prior to the commencement of the work, and whether the work involved the replacement of components damaged by normal wear and tear." Dkt. No. 64-2 at 3-4 (quoting *Pieri v. B&B*

*Welch Accocs.*,, 74 A.D.3d 1727, 1728 (4th Dep't 2010)); *see also Smith v. Shell Oil Co.*, 85 N.Y.2d 1000, 1002 (1995) (finding that changing a light bulb is not a "repair" but is routine maintenance).  Layne contends that Plaintiff's work falls outside of the protections afforded by Section 240(1) because Plaintiff was not hired to fix any specific issue with the pumps and testified that it was his understanding that he would be performing "maintenance and repair," this work was performed on an annual basis, and any repairs would have been to "any part that was worn out."  Dkt. No. 64-2 at 9.

Corning agrees that Plaintiff was not engaged in a covered activity and cites to cases with similar reasoning.  *See* Dkt. No. 66-2 at 4; *see e.g.*, *Jani v. City of New York*, 284 A.D.2d 304, 204 (2d Dep't 2001) (concluding that replacing a worn-out component of an air-handling unit constituted routine maintenance); *Deoki v. Abner Props. Co.*, 48 A.D.3d 510, 510-11 (2d Dep't 2008) ("The plaintiff's work involved the replacement of a worn-out component in a nonconstruction and nonrenovation context and did not constitute erection, demolition, repairing, altering, painting, cleaning, or pointing of a building within the meaning of Labor Law § 240 (1)"); *Stadtmuller v. Metro. Life Ins. Co.*, 271 A.D.2d 361, 361 (1st Dep't 2000) (replacing air filters on an air-purification unit constituted routine, quarterly maintenance).  Corning also relies on the PO which states that Layne would "do our Annual Pm" and that "[i]f there is any wear [to] parts that need to be replaced[,] that will be a separate charge. We have some spare Parts on Hand.  I would think that they should be in decent Shape at this time."  Dkt. No. 66-2 at 11; Dkt. No. 27-1 at 1.  "Pm" was understood by Layne and Corning to mean "preventative maintenance."  *See* Dkt. No. 66-2 at 11.  Plaintiff does not disagree.  *See* Dkt. No. 74-3.

Plaintiff states that "an annual servicing is only a starting point in determining whether repair work is needed and conducting those repairs."  Dkt. No 74-2 at 6.  He contends that "[o]n

the day of Mr. Auclair's accident, they were able to replace a shaft and get the pump operational." Dkt. No. 74-2 at ¶ 65; *see also* Dkt. No. 74-3 at ¶¶ 14, 19.  To support this contention, Plaintiff cites his own and Tripp's deposition testimonies.

During Tripp's deposition, he testified that the shaft was usually the part of the pump that would wear out and need to be reordered.  *See* Dkt. No. 64-5 at 36.  He testified that he "probably" took "a shaft because we almost always end up bringing one of the pumps shafts with us." *Id.* at 88.  Plaintiff stated during his deposition that they "may have replaced a shaft.  I'm not a hundred percent sure, but that's a lot of the problem is the shaft . . . .  I'm not sure if we replaced the mechanical seal.  They may have had that on site." Dkt. No. 64-4 at 101.[7]  There is no additional PO for a shaft or any other piece of equipment.  An e-mail from Layne to Corning also stated it was "confirming order for maintenance of your three cooling pumps (301, 302, 303).  This pricing does not include any repair parts but does include an inspection, replacement of motor oil, and packing." Dkt. No. 65-8 at 183-84.  Plaintiff also submitted an affidavit to the Court, but it too states that he "believes" he and Tripp  replaced a shaft.  Dkt. No. 74-5 at ¶¶ 16-17.

All of the testimony demonstrates an uncertainty as to whether a part was replaced and there is no documentary evidence to support that any parts were replaced.  Neither Plaintiff nor Tripp definitively testified that parts were replaced during their maintenance of the pumps.  This is insufficient to create a dispute of material fact as to whether they were replacing parts or conducting routine maintenance.  *See Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 94 (S.D.N.Y. 2020) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997)) ("[A] party

---

[7] A fuller recitation of the deposition testimonies lies in the Court's background section of this decision.

cannot create a triable issue of fact, and thus avoid summary judgment, by renouncing deposition testimony to the effect that he could not remember a particular fact which he now purports to remember"); *see also Hinz v. Vill. of Perry*, No. 13-CV-6302, 2015 WL 3849558, *7 (W.D.N.Y. June 22, 2015), *aff'd*, 667 Fed. Appx. 3 (2d Cir. 2016) (collecting cases) ("A party cannot avoid summary judgment by claiming to be unable to remember facts that are asserted and properly supported by the moving party"); *In re Trilegiant Corp., Inc.*, No. 3:12-CV-0396, 2016 WL 8114194, *10 (D. Conn. Aug. 23, 2016), *aff'd sub nom. Williams v. Affinion Grp., LLC*, 889 F.3d 116 (2d Cir. 2018) ("[The p]laintiffs' testimony, at their depositions, that they either did not remember reading the disclosure or did not remember seeing the enrollment page is also insufficient to create a material issue of fact with respect to consent").

Even if they did replace a shaft in one of the three pumps, it would have been a part of the routine maintenance. *See Esposito*, 1 N.Y.3d at 528. The PO specifically stated that Layne was to perform preventative maintenance and that all of the pumps should be in good shape. *See* Dkt. No. 74-9 at 2. There is no additional PO in the record for additional parts or a request from Corning for Layne to address a specific problem. Plaintiff did not deny or object to Corning's statement that "[t]he Purchase Order and the Terms and Conditions constitute the entire contract between Corning and Layne with respect to the work that was performed the week of May 14, 2018." Dkt. No. 66-3 at ¶ 24; *see also* Dkt. No. 74-3. Plaintiff does not present any evidence that any of the pumps were inoperable or malfunctioning prior to Plaintiff's work. *See Craft*, 257 A.D.2d at 887. Thus, as to the issue of an alteration or repair, Plaintiff has not raised a genuine dispute of material fact because even if a part was repaired, it was part of routine maintenance.

Plaintiff next argues that he was "cleaning" within the meaning of Section 240(1). Dkt. No. 74-1 at 7-8. As Plaintiff explains, the New York Court of Appeals has held that to recover

under Section 240(1), "the plaintiff must have been engaged in a covered activity—'the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure' . . .—and must have suffered an injury as 'the direct consequence of a failure to provide adequate protection against a risk arising from a physically significant elevation differential.'" *Soto v. J. Crew Inc.*, 21 N.Y.3d 562, 566 (2013) (quotations omitted). Instead of requiring the cleaning to be "performed in connection with building construction, demolition, repair work or comparable activities that made a significant physical change to the premises," the Court of Appeals set forth factors for a court to consider when determining whether an activity falls within Section 240(1)'s scope. *Id.* at 567. The court stated as follows:

> [A]n activity *cannot* be characterized as "cleaning" under the statute, if the task: (1) is routine, in the sense that it is the type of job that occurs on a daily, weekly or other relatively-frequent and recurring basis as part of the ordinary maintenance and care of commercial premises; (2) requires neither specialized equipment or expertise, nor the unusual deployment of labor; (3) generally involves insignificant elevation risks comparable to those inherent in typical domestic or household cleaning; and (4) in light of the core purpose of Labor Law § 240(1) to protect construction workers, is unrelated to any ongoing construction, renovation, painting, alteration or repair project.

*Id.* at 568 (emphasis added). The Court of Appeals noted that "[w]hether the activity is 'cleaning' is an issue for the court to decide after reviewing all of the factors. The presence or absence of any one is not necessarily dispositive if, viewed in totality, the remaining considerations militate in favor of placing the task in one category or the other." *Id.* at 568-59.

Plaintiff contends that he and Tripp were required to use specialized equipment to gain access to the pumps, as well as industrial grinders and power washers. *See* Dkt. No. 74-1 at 9. However, there is no evidence that his work required an elevation risk. There is no evidence that the core purpose of the work was related to an ongoing construction, renovation, painting,

alteration or repair project.  As to the frequency of the work, it was not daily or weekly.  It was

annually.  Plaintiff emphasizes that there is no evidence that Layne did work for Corning in 2017

or 2019.  *See* Dkt. No. 74-1 at 10.  Although there is no evidence concerning Layne's work for

Corning in 2017 or 2019, the parties' statements of material facts indicate that the work was

usually done annually and that the work was part of the ordinary maintenance and care of the

water pumps.  *See* Dkt. No. 65-15 at ¶ 5; Dkt. No. 74-2 at ¶ 8; Dkt. No. 74-3 at ¶ 5.  The work

was not a specific, specialized cleaning request but was related to general maintenance.  Based on

the Court's review of the relevant factors, it concludes that Plaintiff was not engaged in the type of

"cleaning" that Section 240(1) is intended to cover.  Accordingly, Plaintiff's work does not fall

under Labor Law Section 240 and summary judgment is warranted in favor of Corning and Layne

on this claim.

**D.      Labor Law Section 241(6)**

Corning and Layne move for summary judgment on Plaintiff's Section 241(6) claims,

arguing that Plaintiff was not engaged in any work that falls under the statute.  Labor Law §

241(6) provides as follows:

> All areas in which construction, excavation or demolition work is
> being performed shall be so constructed, shored, equipped, guarded,
> arranged, operated and conducted as to provide reasonable and
> adequate protection and safety to the persons employed therein or
> lawfully frequenting such places.  The commissioner may make
> rules to carry into effect the provisions of this subdivision, and the
> owners and contractors and their agents for such work, except
> owners of one and two-family dwellings who contract for but do not
> direct or control the work, shall comply therewith.

N.Y. Lab. L. § 241(6).

"New York Labor Law § 241(6) 'requires owners and contractors to provide reasonable

and adequate protection and safety for workers and to comply with the specific safety rules and

regulations promulgated by the Commissioner of the Department of Labor.'" *Friebely v. C.D. Perry & Sons, Inc.*, 624 F. Supp. 3d 160, 194-95 (N.D.N.Y. 2022) (quoting *Ross v. Curtis-Palmer Hydro-Electric., Co.*, 81 N.Y.2d 494, 501 (1993)).  "The duty set forth in New York Labor Law § 241(6) is nondelegable, meaning liability can be imposed upon a general contractor for the negligence of a subcontractor, even in the absence of control or supervision of the worksite." *Id.* (quoting *Rizzuto v. L.A. Wenger Contr. Co.*, 91 N.Y.2d 343, 348-49 (1998)) (additional quotation and quotation marks omitted).  "It is well established that, in a Labor Law § 241(6) claim, the rule or regulation alleged to have been breached must be a 'specific, positive command.'" *Id.* (quoting *Gasques v. State of N.Y.*, 15 N.Y.3d 869, 870 (2010)) (additional quotation and quotation marks omitted).  "'[Alt]hough this language differs significantly from the far more encompassing language of Labor Law § 240(1) . . . [,] the scope of Labor Law § 241(6) is governed by 12 NYCRR 23-1.4(b)(13) which defines construction work expansively [to include] "[a]ll work of the types performed in the construction, erection, alteration, repair, maintenance, painting[,] or moving of buildings or other structures."'" *Nooney v. Queensborough Pub. Libr.*, 212 A.D.3d 830, 832 (2d Dep't 2023) (quoting *Vernieri v. Empire Realty Co.*, 219 A.D.2d 593, 595 (2d Dep't 1995)) (alterations in original).

    "To establish liability under this section, the plaintiff must allege a violation of at least one of the implementing regulations set forth by the Commissioner of the Department of Labor." *Gary Laverty v. Dobco, Inc.*, No. 7:21-CV-2592, 2024 WL 966013, *8 (S.D.N.Y. Mar. 6, 2024) (quoting *Walter v. CSX Transp. Inc.*, No. 22-1254, 2023 WL 4044113, *1 (2d Cir. June 16, 2023)).  "'Because the statutory duty imposed is nondelegable, a plaintiff need not show that the defendants exercised supervision or control over the work site in order to establish liability.'" *Roberts v. Globalfoundries, U.S., Inc.*, No. 1:13-CV-1169, 2015 WL 12942046, *6 (N.D.N.Y.

Sept. 14, 2015) (quoting *Lawler v. Globalfoundries U.S., Inc.*, No. 1:12-CV-327, 2014 WL 4900480, *4 (N.D.N.Y. Sept. 30, 2014)).  "However, 'comparative negligence remains a cognizable affirmative defense to a section 241(6) cause of action.'"  *Id.* (quotation marks and quotation omitted).

As an initial matter, Plaintiff did not identify a specific New York Department of Labor regulation in his complaint.  *See* Dkt. No. 2 at ¶¶ 28-32.  Corning and Layne argue that dismissal is appropriate because of Plaintiff's failure to plead a specific regulatory violation.  *See* Dkt. No. 66-2 at 9-10; *see also* Dkt. No. 64-2 at 5-6.  Plaintiff concedes that he did not allege a violation of a specific Industrial Code regulation in his complaint.  *See* Dkt. No. 74-1 at 15.  However, Plaintiff argues this is because there is no Bill of Particulars in federal court, which would have been sought in state court.  *See id.* at 16.  Plaintiff also notes that he responded to Layne's interrogatory requests by listing the following regulation violations: 23-1.5, 23-1.7(a), 23-1.8, 23-1.17, 23-1.18, 23-1.19, 23-1.31, 23-1.32, 23-1.33, 23-2.1, 23-2.5, 23-2.33, 23-6.1, 23-6.2, 23-6.3. *See id.*; *see also* Dkt. No. 74-8 at 11.  Plaintiff states that "[t]hese Rule 23 sections require that workers be protected from overhead hazards such as the ones to which [Plaintiff] was exposed." Dkt. No. 74-1 at 16.  Plaintiff presently seeks to amend his complaint to allege violations of Industrial Code regulations 23-1.5(c)(1-3) and 23-1.7(a).  *See id.* at 18.

Although Plaintiff failed to plead a specific Code violation, he did list them in response to the interrogatory request and in response to the motions for summary judgment, to which Corning and Layne replied.  *See* Dkt. Nos. 80, 81.  Because the Court concludes that there is no dispute that Plaintiff was not performing work as required under Section 246(1), the Court declines to grant Corning and Layne's request to dismiss for failure to plead a specific violation.  *See Gary Laverty v. Dobco, Inc.*, No. 7:21-CV-2592, 2024 WL 966013, *8 n.38 (S.D.N.Y. Mar. 6, 2024)

("The Court is inclined to believe that the need to plead an essential element to a claim is governed by federal procedural law, rather than state law.  However, because the Court concludes that summary judgment is warranted in favor of Dobco on Laverty's § 241(6) claim, the Court will assume, without deciding, that Laverty sufficiently pleaded violations of New York Department of Labor regulations by asserting such violations in his opposition to Dobco's cross-motion for summary judgment").[8]

"Section 241(6) is limited to 'industrial accidents specifically in connection with construction, demolition or excavation work.'"  *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 44 F. Supp. 3d 409, 436 (S.D.N.Y. 2014) (quoting *Nagel v. D & R Realty Corp.*, 99 N.Y.2d 98, 101 (2002)).  "The Courts look to the regulations implementing section 241(6) to determine what constitutes 'construction, excavation or demolition.'"  *Id.* (quoting *Joblon v. Solow*, 91 N.Y.2d 457, 466 (1998)).  The New York Industrial Code defines "construction work" as follows:

> All work of the types performed in the construction, erection, alteration, repair, maintenance, painting or moving of buildings or other structures . . . by way of illustration but not by way of limitation, the work of hoisting, land clearing, earth moving, grading, excavating, trenching, pipe and conduit laying, road and bridge construction, concreting, cleaning of the exterior surfaces including windows of any building or other structure under construction, equipment installation and the structural installation of wood, metal, glass, plastic, masonry and other building materials in any form or for any purpose.

12 N.Y.C.R.R. § 23-1.4(b)(13).  "Demolition work" is defined as follows: "work incidental to or associated with the total or partial dismantling or razing of a building or other structure including the removing or dismantling of machinery or other equipment."  *Id.* § 23-1.4(b)(16).  "Excavation

---

[8] Based on this conclusion, the Court denies Plaintiff's request to amend his complaint as moot.

work" is defined as follows: "The removal of earth, rock or other material in connection with construction or demolition operations." *Id.* § 23-1.4(b)(19).

"'[C]leaning' may fall within the ambit of section 241(6) if the task is non-routine and connected to construction, excavation or demolition." *In re World Trade Ctr.*, 44 F. Supp. 3d at 436-37 (citing *Rivera v. Ambassador Fuel & Oil Burner Corp.*, 45 A.D.3d 275, 276 (1st Dep't 2007) ("The work performed by plaintiffs involved more than a simple cleaning of a fuel tank, and was part of a more comprehensive, overall contract for the installation of a new boiler. Based on these facts, it cannot be said, as a matter of law, that the cleaning of the tank was not related to construction")); *see also Quintanilla v. United Talmudical Acad. Torah V'yirah, Inc.*, 967 N.Y.S.2d 869 (Sup. Ct. 2013) ("[T]he reference to 'cleaning' in the regulation refers only to 'cleaning of the exterior surfaces including windows of any building or other structure under construction,' a circumstance not present here"). "The Industrial Code definition of 'construction work,' which includes maintenance, must be construed consistently with this Court's understanding that section 241(6) covers industrial accidents that occur in the context of construction, demolition and excavation." *Nagel v. D & R Realty Corp.*, 99 N.Y.2d 98, 103 (2002) (citations omitted).

Plaintiff has not established that he was engaged in construction, demolition, or excavation. In his memorandum of law, Plaintiff emphasizes that he was cleaning the pumps. *See* Dkt. No. 74-1 at 15. That cleaning was not part of any construction, demolition, or excavation such that it does not save his claim. *See In re World Trade Ctr.*, 44 F. Supp. 3d at 436-37. Even if Plaintiff was engaged in work covered under Section 241(6), he has not established an entitlement to relief under either of his proposed Industrial Codes because he was

not engaged in work that is normally exposed to falling material or objects and he has not

identified a piece of equipment that was inoperable.

Industrial Code 23-1.5(c) states as follows:

> (c) Condition of equipment and safeguards.
>
> > (1) No employer shall suffer or permit an employee to use any machinery or equipment which is not in good repair and in safe working condition.
> >
> > (2) All load carrying equipment shall be designed, constructed and maintained throughout to safely support the loads intended to be imposed thereon.
> >
> > (3) All safety devices, safeguards and equipment in use shall be kept sound and operable, and shall be immediately repaired or restored or immediately removed from the job site if damaged.

12 N.Y.C.R.R. § 23-1.5(c).  Industrial Code 23-1.7(a) provides as follows:

> (a) Overhead hazards.
>
> > (1) Every place where persons are required to work or pass that is normally exposed to falling material or objects shall be provided with suitable overhead protection. Such overhead protection shall consist of tightly laid  sound planks at least two inches thick full size, tightly laid three-quarter inch exterior grade plywood or other material of equivalent strength.  Such overhead protection shall be provided with a supporting structure capable of supporting a loading of 100 pounds per square foot.

*Id.* § 23-1.7(a).

Plaintiff contends that "it is clear that the work [he] and Mr. Tripp were performing

constituted construction and demolition of a building or structure."  Dkt. No. 74-1 at 15.  He does

not present any other argument to support that contention.  *See id.*  Plaintiff's argument

concerning Sections 23-1.5(c)(1-3) is that "there are cases that have been decided regarding these

sections which have supported that cause of action." Dkt. No. 74-1 at 18.  Plaintiff's argument on Section 23-1.7(a) is that "[c]learly, Defendant Corning was aware of the allegations being made with respect to the standards set forth in the Industrial Rule Code 23, and there has been no prejudice to them; there is thus justification for denying the Defendant's motion with respect to Labor Law § 241(6)."  Dkt. No. 74-1 at 19.  In Plaintiff's argument requesting to amend his complaint to plead specific Industrial Codes, he does not expand on how the conduct at issue falls under the Codes.  *See id.* at 19-21.

Plaintiff's own expert, Ernest Gailor, created a report on June 23, 2022, which concludes that Corning violated New York State Labor Law § 241(6) because Corning failed to maintain the hoist and chain fall in a safe and properly operational condition as required under Section 23-6.1(b).  *See* Dkt. No. 74-6 at 10.  Gailor did not find that Corning violated either Section 23-1.5(c) or 23-1.7(a), which are the two sections Plaintiff now argues are applicable and were violated. *See* Dkt. No. 74-1 at 18-19.  Subsequent to Corning and Layne filing their motions for summary judgment, Gailor completed a supplemental affidavit in which he stated that "[i]t has been brought to my attention by plaintiff's counsel, that the defendant is also making a motion to dismiss the plaintiff's Labor Law § 241(6) claim in view of the fact that specific allegations that the plaintiff has not set forth clear and concrete specific violations of Industrial Rule Code 23 violated by the defendants." Dkt. No. 74-6 at ¶ 12.  Gailor also explains that "counsel has brought my attention to Industrial Rule Code 23 § 1.5(c)(1-3) and 1.7(a).  Having review [sic] these more closely, it is my opinion that they do apply to the facts and circumstances of this accident and also support the allegations of negligence in Labor Law § 240 violations being alleged by the plaintiff." *Id.* Gailor concludes that Corning failed to maintain the chain fall in a safe and proper working condition being they allowed "the device to have no stops or stays." *Id.* at ¶ 13.  He also states

that it is his "opinion that the Defendant Corning violated Labor Law § 241(6) with a reasonable

degree of engineering certainty and expertise, in that the Plaintiff was not given protection from

falling objects." *Id.* at ¶ 16.

Contrary to Gailor's conclusory findings, as to Section 23-1.7(a), there is no evidence that

Plaintiff was working in an area that was normally exposed to falling materials. This forecloses

Plaintiff's ability to succeed on a Labor Law Section 241(6) claim utilizing Section 23-1.7(a). *See*

*Quinlan v. City of New York*, 293 A.D.2d 262, 263 (1st Dep't 2002) ("Since there is no evidence

that plaintiff was working in or frequenting an area that was 'normally exposed to falling material

or objects,' the proposed claim based on 12 NYCRR 23-1.7(a) is without merit and was properly

rejected"); *Cruz v. 451 Lexington Realty, LLC*, 218 A.D.3d 733, 737(2d Dep't 2023) (affirming

grant of summary judgment where the defendants "established, prima facie, that 12 NYCRR 23-

1.7(a) was inapplicable to the facts of this case by submitting evidence that the area where the

incident occurred was not 'normally exposed to falling material or objects' within the meaning of

12 NYCRR23-1.7(a)"); *Alvarado v. Bermuda Realty, No. 2 LLC*, 177 N.Y.S.3d 837, 2022 WL

17246275, *2 (N.Y. Sup. Ct. 2022) ("12 NYCRR 23-1.7(a)(1) is applicable where the area where

[the] plaintiff was working was normally exposed to falling material or objects, not where it is

merely foreseeable that an object could fall").

As to Section 23-1.5(c), courts have concluded that "[a]lthough 12 NYCRR § 23–1.5(c)(1)

and (2) are too general to serve as Labor Law § 241(6) predicates, 12 NYCRR § 23-1.5(c)(3) is

sufficiently specific to support a claim." *Jackson v. Hunter Roberts Constr. Grp., LLC*, 161

A.D.3d 666, 667-68 (1st Dep't 2018) (citing *Becerra v. Promenade Apartments Inc.*, 126 A.D.3d

557, 558 (1st Dep't 2015)); *see also In re World Trade Ctr.*, 44 F. Supp. 3d at 441 ("Rule 23-

1.5(c), which requires that equipment be 'immediately repaired or restored' and 'immediately

removed from the job site if damaged,' is a sufficiently 'concrete, positive' command to support [a] section 241(6) claim").

There is no evidence in the record that Corning or Layne were aware of a defect or damage that they failed to immediately repair or restore. *See Gonzalez v. Gotham Org. Inc.*, No. 16-CV-607, 2023 WL 6214544, *5 (E.D.N.Y. Sept. 25, 2023) ("Gonzalez presents evidence that the Mudpuppy was not properly repaired, restored, or removed from the job site, while Gotham Defendants cite evidence that, because Nicholson had reported every issue, the Mudpuppy was not damaged, and there was no violation of the provision. Accordingly, there are triable issues of material fact"); *Williams v. River Place II, LLC*, 145 A.D.3d 589, 589-90 (1st Dep't 2016) ("[E]vidence that there were teeth missing from the blade of the saw that [the] plaintiff was using when he was injured raises issues of fact whether defendants River Place II, LLC, as the alleged owner, Larry Silverstein as the owner's alleged agent, and Gotham Construction, Co., LLC, as the general contractor . . . [The p]laintiff claims he was injured while using a power saw with a blade with broken teeth. He further claims *he twice asked his supervisor for a replacement blade which was not furnished*"); *Viruet v. Purvis Holdings LLC*, 198 A.D.3d 587, 588 (1st Dep't 2021) ("[T]he motion court erred in finding that there are triable issues of fact . . . [The p]laintiff was directed to use a visibly defective grinder that had no blade, safety guard or side handle. There was also no cut-off switch. While he was using the grinder, it spontaneously cut off and then turned back on, without plaintiff engaging the power switch. When plaintiff complained, he was instructed to proceed with the defective grinder or go home. . . . [the] plaintiff's accident would not have occurred if defendants had removed the grinder from use because it was either not in good condition or not working properly"); *Nicholson v. Sabey Data Ctr. Properties, LLC*, 205 A.D.3d 620, 621 (1st Dep't 2022) ("The court correctly denied Sabey defendants summary

judgment dismissing the Labor Law § 241(6) claim predicated on 12 NYCRR 23-1.5(c)(3).  [The p]laintiff's testimony that he had been having problems with the pallet jack, including shortly before the accident when he dropped off the first two pallets of cinderblocks raises an issue of fact as to a violation of that provision").

There is no evidence that Plaintiff notified Layne or Corning about the lack of an end stop, that the equipment was not sound or operable, or that Layne or Corning failed to remedy the situation.  As explained, Plaintiff's own expert did not find a violation of Section 23-1.5(c)(3) until Plaintiff's counsel brought it to his attention.  *See* Dkt. No. 74-6; *see also Desprez v. United Prime Broadway, LLC*, __A.D.3d__, 2024 WL 1200235, at *1 (1st Dep't 2024) (holding that the trial court should have denied the defendants' motion to dismiss because "the deposition testimony established that plaintiff's grinder had no guard, thus violating the mandate of the regulation" and the "[p]laintiff also proffered evidence that defendants had notice of a defect in the grinder, as he testified that he complained to his supervisor that the grinder shook and lacked a guard").  Based on the foregoing, Plaintiff has not established that he was engaged in the type of work covered by Section 241(6) such that summary judgment is warranted in Corning and Layne's favor.

### E.   Labor Law Section 200 and Common Law Negligence

Corning and Layne move for summary judgment against Plaintiff for his Labor Law Section 200 and common law negligence claims.  *See* Dkt. No. 64-2 at 8-9; Dkt. No. 66-2 at 11-23.

"Section 200 of the Labor Law is a codification of the common-law duty imposed upon an owner or general contractor to provide . . . workers with a safe place to work." *Comes v. N.Y. State Elec. & Gas Corp.*, 82 N.Y.2d 876, 877 (1993).  "Unlike claims arising under § 240(1) and

§ 241(6), [] Labor Law § 200 requires [the] plaintiff to prove that [the] defendant 'exercised some supervisory control over the operation.'"  *Wojcik v. 42nd St. Dev. Project*, 386 F. Supp. 2d 442, 456 (S.D.N.Y. 2005) (quoting *Ross v. Curtis-Palmer Hydro-Electric Company et al.*, 81 N.Y.2d 494, 501 (1993)).  "This rule is consistent with the common law principle that 'an owner or general contractor could not be held responsible for the negligent acts of others over whom he had no direction or control.'"  *Id.* (quoting *Allen v. Cloutier Const. Corp.*, 44 N.Y.2d 290, 299 (1978)).  Common-law negligence claims are analyzed under the same standards as Labor Law § 200 claims, requiring the owner or contractor to have some control over a work situation before either can be held liable for negligence."  *Roberts v. Globalfoundries, U.S., Inc.*, No. 1:13-CV-1169, 2015 WL 12942046, *10 (N.D.N.Y. Sept. 14, 2015) (citing *Ortega v. Puccia*, 57 A.D.3d 54, 61 (2d Dep't 2008)).  "[C]omparative negligence is a viable defense to a cause of action asserted under" Labor Law § 200.  *Drago v. New York City Transit Authority*, 227 A.D.2d 372, 373 (2d Dep't 1996).

Cases involving Section 200 fall into "two broad categories, namely those where workers are injured as a result of dangerous or defective premises conditions . . . and those involving the manner in which the work is performed."  *Mondragon-Moreno v. Sporn*, 189 A.D.3d 1574, 1576 (2d Dep't 2020).  When a Plaintiff alleges that a premises condition, whether an existing defect or dangerous condition, caused her accident, "liability attaches if the owner or general contractor created the condition or had actual or constructive notice of it."  *Jackson v. Hunter Roberts Constr., LLC.*, 205 A.D.3d 542, 543 (1st Dep't 2022).  "[F]or injuries arising from the manner in which work is performed, a defendant must have authority to exercise supervision and control over the work."  *Rodriguez v. Metropolitan Transp. Auth.*, 191 A.D.3d 1026, 1027 (2d Dep't 2021) (quoting *Rojas v. Schwartz*, 74 A.D.3d 1046, 1046 (2d Dep't 2010)).

"More specifically, where '[t]here is no evidence that [an owner or contractor] gave anything more than general instructions on what needed to be done,' and instead provided only 'monitoring and oversight of the timing and quality of the work,' a court should not impose liability under Labor Law § 200 or under the common law." *Friebely v. C.D. Perry & Sons, Inc.*, 624 F. Supp. 3d 160, 192 (N.D.N.Y. 2022) (quoting *Mitchell v. NRG Energy, Inc.*, 125 A.D.3d 1542, 1543-44 (4th Dep't 2015)) (additional quotation and quotation marks omitted). "'[G]eneral supervisory authority at a work site for the purpose of overseeing the progress of the work and inspecting the work product is insufficient to impose liability . . . under Labor Law § 200.'" *Id.* (quoting *Lawler*, 2014 WL 4900480, at *10)) (additional quotation and quotation marks omitted).

"Similarly, 'a general duty to ensure compliance with safety regulations or the authority to stop work for safety reasons is insufficient to raise a triable issue of fact'" on such a claim. *Timmons v. Barrett Paving Materials, Inc.*, 83 A.D.3d 1473, 1476 (4th Dep't 2011) (quoting *McCormick v. 257 W. Genesee, LLC*, 78 A.D.3d 1581, 1581 (4th Dep't 2010)); *see also Perri v. Gilbert Johnson Enters., Ltd.*, 14 A.D.3d 681, 683 (2d Dep't 2005) ("[T]he authority to review safety at the site is insufficient if there is no evidence that the defendant actually controlled the manner in which the work was performed"); *Shelley v. Flow*, 283 A.D.2d 958, 959 (4th Dep't 2001) (quotation omitted) ("The contractual duty to oversee the performance of work, inspect the work site and ensure compliance with safety regulations does not constitute supervision and control over the subcontractor's methods of work"); *World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 44 F. Supp. 3d 409, 428 (S.D.N.Y. 2014) ("But a duty arises not only when a defendant had the authority to actively control a plaintiff's work on a daily basis but, rather, when a defendant had the authority to correct or prevent [the] unsafe condition giving rise to a plaintiff's injuries").

"[W]hen a defendant property owner lends allegedly dangerous or defective equipment to a worker that causes injury during its use, the defendant moving for summary judgment must establish that it neither created the alleged danger or defect . . . nor had actual or constructive notice of [it]." *Chowdhury v. Rodriguez*, 57 A.D.3d 121, 129 (2d Dep't 2008); *see also Friebely v. C.D. Perry & Sons, Inc.*, 624 F. Supp. 3d 160, 192-93 (N.D.N.Y. 2022) (quoting *Dwyer v. Goldman Sachs Headquarters, LLC*, 819 F. Supp. 2d 320, 329 (S.D.N.Y. 2011)).  If an accident is alleged to have involved "both the premises and the equipment used at the work site, a defendant moving for summary judgment . . . is obligated to address the proof applicable to both liability standards." *Rodriguez*, 191 A.D.3d at 1027-28; *see also Reyes v. Arco Wentworth Mgmt. Corp.*, 83 A.D.3d 47, 49 (2d Dep't 2011).

"'[A] subcontractor "may be held liable for negligence where the work it performed created the condition that caused the plaintiff's injury even if it did not possess any authority to supervise and control the plaintiff's work or work area."'" *Yang v. City of New York*, 207 A.D.3d 791, 795-96 (2d Dep't 2022) (quoting *Cando v. Ajay Gen. Contracting Co. Inc.*, 200 A.D.3d 750, 753 (2d Dep't 2021)) (additional quotation omitted).  "Moreover, '[a]n award of summary judgment in favor of a subcontractor on a negligence or Labor Law § 200 cause of action is improper where the evidence raise[s] a triable issue of fact as to whether [the subcontractor's] employee created an unreasonable risk of harm that was the proximate cause of the injured plaintiff's injuries.'" *Id.* (quoting *Cando*, 200 A.D.3d at 753-54).

As an initial matter, in Layne's motion against Plaintiff, it argues that Plaintiff is the *sole* cause of his own injuries.  *See* Dkt. No. 64-2 at 8-9.  Corning cites to Layne's summary judgment motion against Plaintiff, in which Layne stated that "[Auclair's] [n]egligence [w]as [t]he [s]ole [c]ause [o]f [h]is [a]ccident[,]" "it was Plaintiff's own actions that brought about his accident[,]"

and "Plaintiff's injuries were brought about entirely by his own negligent action[.]"  Dkt. No. 82 at
2-3 (alterations in original) (citations and emphasis omitted).  Corning also recounts statements in
Layne's counsel's affidavits submitted with its motion against Plaintiff and in opposition to
Corning's summary judgment motion which state that (1) "'it was Plaintiff's own negligence that
brought about his accident and he is therefore barred from recovery'"; but (2) "Corning has
'contributed to the condition that caused the hoist to fall and allegedly injure the Plaintiff.'"  *Id.* at
3 (quoting Dkt. No. 64-3 at ¶ 11; Dkt. No. 72-1 at ¶ 9).  However, in its motion against Corning,
Layne argues that Corning was negligent in failing to maintain safe premises.  *See* Dkt. No. 72 at
4.  To support its contention that "Corning both created and was aware of the dangerous condition
existing within its facility[,]" Layne relies on VanCise's testimony that there should have been a
permanent end stop on the I-beam and Dusseault's testimony that it would be "best practice" to
have an end stop placed on the I-beam.  *Id.* at 5-6.

Corning argues that a "statement by plaintiff's counsel in an affirmation submitted upon
the plaintiff's summary judgment motion as to the cause of the accident was a judicial admission
and binding in the absence of a sufficient explanation."  Dkt. No. 82 at 3 (citing *Walsh v. Pyramid
Co. of Onondaga*, 228 A.D.2d 259, 260 (1st Dep't 1996)).  "[I]n order to constitute a judicial
admission, the statement must be one of fact."  *Naughton v. City of New York*, 94 A.D.3d 1, 12
(1st Dep't 2012) (citing *People v Brown*, 98 N.Y.2d 226, 232 n.2 (2002); *GJF Constr., Inc. v
Sirius Am. Ins. Co.*, 89 A.D.3d 622, 624 (1st Dep't 2011); *Rahman v Smith*, 40 A.D.3d 613, 615
2d Dep't 2007)) (concluding that the "legal arguments" concerning whether the "plaintiff was the
sole proximate cause of the accident" did "not constitute judicial admissions"); *see also In re
Motors Liquidation Co.*, 957 F.3d 357, 360 (2d Cir. 2020) (citations omitted) ("A judicial
admission is a statement made by a party or its counsel which has the effect of withdrawing a fact

from contention and which binds the party making it throughout the course of the proceeding. . . . To constitute a judicial admission, the statement must be one of fact—a legal conclusion does not suffice").

The Court acknowledges the inconsistency in Layne's contentions.  It strains credulity that Layne argues in one motion that Plaintiff is the *sole* cause of his accident, but then in another motion, contends that Corning was actively negligent in causing Plaintiff's accident.  However, because the inconsistency relates to legal arguments, the Court will not accept Layne's contentions as judicial admissions.  Therefore, the Court will analyze whether summary judgment is warranted on Plaintiff's Section 200 and negligence claims based on the manner and means and defective condition theories of negligence.

First, "[w]here the injury was caused by the manner and means of the work, including the equipment used, the owner or general contractor is liable if it actually exercised supervisory control over the injury-producing work.'" *Jackson v. Hunter Roberts Constr., L.L.C.*, 205 A.D.3d 542, 543 (1st Dep't 2022) (quoting *Cappabianca v. Skanska USA Bldg. Inc.*, 99 A.D.3d 139, 144 (1st Dep't 2012)); *see Davis v. Cumberland Farms, Inc.*, No. 1:10-CV-480, 2013 WL 375477, *6 (N.D.N.Y. Jan. 29, 2013) ("Cumberland retained, at best, general supervisory authority over the construction at the Glenmont worksite. . . .  According to . . . Cumberland's project manager for the Glenmont worksite, he visited the Glenmont worksite weekly to monitor the progress and quality of work and to ensure safety compliance. . . .  [His] visits, however, do not amount to the level of supervision and control necessary to hold Cumberland liable for Davis' injuries under Labor Law § 200. . . .  This is particularly true where [the project manager] asserted, in a sworn affidavit dated April 25, 2012, that no Cumberland representative, including him, supervised or controlled Davis' work, and [Davis] offered no contrary evidence").

It is undisputed that neither Layne nor Corning exercised supervisory control over Plaintiff's work.  No Layne or Corning employee was in the pump room supervising the work. Although Reinheimer instructed Layne employees how best to do the work, he assumed that there was an end stop in place and he expected employees to inspect for an end stop.  *See* Dkt. No. 74-2 at ¶¶ 35, 39.  He was not there on the date of the accident and did not direct the precise steps that Plaintiff should have taken.  Additionally, although Stewart, a Corning employee, unlocked the pump houses for Plaintiff and Tripp to enter them, and McCann, another Corning employee, would walk through the pump rooms to inspect them, there is no evidence in the record that they had any control over Plaintiff's work.  *See* Dkt. No. 65-15 at ¶ 27.  His walking through the rooms is insufficient to hold Corning liable under these circumstances.  *See O'Sullivan v. IDI Const. Co.*, 28 A.D.3d 225, 225 (1st Dep't), *aff'd*, 7 N.Y.3d 805 (2006) ("[The p]laintiff, while working as the employee of a subcontractor at a construction site, tripped over an electrical pipe protruding two or three feet from a newly laid floor. . . .  [W]hile the general contractor's on-site safety manager may have had overall responsibility for the safety of the work done by the subcontractors, such duty to supervise and enforce general safety standards at the work site was insufficient to raise a question of fact as to its negligence").  Therefore, Plaintiff's claim under a manner and means theory, fails.

Second, "'[w]here an existing defect or dangerous condition caused the injury, liability attaches if the owner or general contractor created the condition or had actual or constructive notice of it." *Jackson*, 205 A.D.3d at 543.  Courts have denied summary judgment where there are "two conflicting factual accounts" concerning when a defect or damage occurred.  *Morales v. C&S Wholesale Grocers, Inc.*, No. 18-CV-3625, 2023 WL 5047893, *6-7 (S.D.N.Y. Aug. 8, 2023); *see also Yang*, 207 A.D.3d at 795-96 (concluding that the defendant "failed to

demonstrate, *prima facie*, that it did not create the dangerous condition that allegedly caused the injured plaintiff's injury, namely, the improper placement across the shaft opening of aluminum planks identical to those utilized by [the defendant] during its work creating a CMU wall adjacent to the shaft").  In *Morales*, the plaintiff testified that "he did not see anything wrong with the pallet jack during his pre-trip inspection on the day of his accident . . . and he did not see anything wrong with it during his subsequent inspection (after he was thrown off for the first time) . . ., but he did not conduct any inspection after he was thrown off for the second time."  *Id.*  The court concluded that "[t]his account seems to suggest that the damage was likely sustained to the wheel after [the p]laintiff's second fall."  *Id.*  "However, the maintenance report from the day after the accident paints a different picture.  It states that the cause of the accident was 'due to the fact [that] the operator kept driving the jack like that even after he claims he did a pre inspection on it.'"  *Id.*  Thus, "[t]his account appears to suggest that the damage was already apparent prior to [the p]laintiff's fall, and that perhaps [the p]laintiff was not thorough in his pre-trip inspection of the pallet jack."  *Id.*

To argue that Corning was negligent, Layne relies, in part, on *Wohlfron v. Brooklyn Edison Co.*, 238 A.D. 463, 466 (2d Dep't), *aff'd*, 263 N.Y. 547 (1933).  *See* Dkt. No. 72 at 4.   In *Wohlfron*, "[t]he defendant was engaged in the construction of a large addition to its building and let out different parts of the work to contractors, by one of whom the plaintiff was employed.  The defendant maintained, through its own engineers and inspectors, general supervision and control over the work."  *Id.* at 464.  "The plaintiff at the time of the accident was proceeding to the place where his work was to be performed and it was necessary to pass along a concrete slab about fifty-eight inches in width."  *Id.*  "This slab had been completed by another contractor at least six months before the date of the accident.  About two weeks before the accident a number of holes

had been cut near the outside of the concrete slab by still another contractor for purposes connected with the work of construction." *Id.* "The holes were undisclosed in the dim light furnished by the owner, and there was nothing to warn him of their presence.  In passing along in the manner described, the plaintiff stepped into one of these holes, lost his balance and fell twenty-six feet to 'an economizer coil' or 'boiler tubes,' receiving very serious injuries." *Id.* at 465.

The court concluded "that a sufficient cause of action based on negligence has been shown." *Id.* at 466.  It concluded as such because "[t]he defendant had possession and control of the building, and its engineers and inspectors attended each day during the time of construction to see that 'the specifications and the contracts were being lived up to,' and to have charge of 'safety.' In effect their duties were 'to see that the work goes along smoothly to final completion' and 'looking after the interests' of the defendant." *Id.* (quotation omitted).  "Admittedly, it was the duty of the defendant's superintendents and inspectors to point out any condition they noticed that was 'glaringly unsafe about the work.'  We think the defendant failed in its duty." *Id.* at 466-67.

Here, there is no evidence in the record that establishes that Corning knew there was no end stop placed on the I-beam at the time of Plaintiff's accident.  Rather, Stewart, a Corning employee, testified that prior to Plaintiff's accident, he had "noticed that, when the work was being performed, there was a C-clamp always put on the end of the I-beam."  Dkt. No. 65-10 at 81.  He testified that the individuals that would put the clamp on the I-beam were "the people doing the work." *Id.* at 82.  Tripp testified that he did not look to see if there was an end stop on the I-beam. *See* Dkt. No. 65-9 at 95.  However, when he first visited the plant in 2012, there was "a little C-clamp that screws onto the beam so the trolley will hit that before [it] could come off." *Id.* at 48.  On the date of the incident, he could not "remember either seeing it or not seeing it."

53

*Id.* at 80.  He did remember taking the chain fall down, lubricating it, and placing it back over the pump.  *See id.* at 88-90, 92.  Tripp noted that both he and Plaintiff were "responsible to look around and see if anything is abnormal or isn't right."  *Id.* at 94.  Tripp successfully used the chain fall to lift the motor.  *See id.* at 98-99.  Tripp then used the chain fall to start pulling out the pump. *See id.* at 100.  It was only once Plaintiff pulled the chain out of Tripp's hands that the trolley came off the I-beam.  *See id.* at 100-01.

It is true, that after the accident, VanCise conducted an investigation and concluded that the accident occurred because "[n]o end stop on the beam to keep assembly from falling."  Dkt. No. 72-2 at 68.  He testified that there should have been an end stop, specifically, a permanent end stop.  *See id.*  Dusseault also testified "that it would be best practice to have" "a stop in place." Dkt. No. 65-6 at 49.  However, Dusseault believed that it was Layne who installed the hoist as part of their work and because they moved the hoist from one pump to the other, he believed that a clamp stop was typically installed at the end of the I-beam.  *See id.* at 49-51.

This is not a situation where Corning noticed a condition "that was 'glaringly unsafe about the work.'"  *Wohlfron*, 238 A.D. at 466.  Rather, this case more closely parallels *Reilly v. Newireen Assocs.*, 303 A.D.2d 214, 223 (1st Dep't 2003).  In *Reilly*, the plaintiff was "a steamfitter, had been working for his employer, Centrifugal, on a construction job at 660 Madison Avenue, a 24–story building owned by Newireen.  Newireen hired LMB as construction manager, which, in turn, hired Centrifugal as the heating, ventilation and air conditioning subcontractor and Universal as the subcontractor responsible for installing and maintaining the elevators, hoists and scaffolds."  *Id.* at 215.  "On the date of the accident, Reilly was working with others to install piping on the 20th through 24th floors of the building.  The pipes were sixteen inches in diameter, twenty feet long and weighed approximately one ton.  The work involved raising the pipes

through a vertical shaft, as the workers took turns guiding them through the shaft, floor by floor. At the 18th floor, two pipes would be welded together and then raised to the higher floors. After the pipe was unloaded at the top, Reilly and the others would go back down to the 10th floor and repeat the process." *Id.* "Normally, the workers and their tools would be transported between the floors by a personnel hoist known as an 'Alimac,' which was a cage that rode up and down the exterior of the building. There were two personnel Alimacs at this work site, one on the 61st Street side of the building that went up to the 24th floor (61st Street hoist), and one on the 60th Street side that only went up to the 15th floor." *Id.*

"[O]n the date of [the plaintiff's] death, while a second pipe was being raised that day, the 61st Street hoist broke down. The hoist operator, an LMB employee, reported the breakdown to the LMB superintendent, who radioed the information to Universal's office requesting repairs. Meanwhile, Reilly's supervisor, another Centrifugal employee, directed that the work continue because the pipe could not be left dangling in the shaft. This necessitated that [the plaintiff] and the others walk up at least 14 flights of stairs to finish raising the pipe, and then do so again when another pipe was raised after lunch. [The plaintiff] went home at 3:30 P.M. and laid down to rest. He subsequently had a heart attack and was pronounced dead at 7:32 P.M. that evening." *Id.* at 215-16. The court concluded that the negligence and Section 200 claims against the owner had to be dismissed because the owner "never directed or controlled the means or methods of the work performed by any of the contractors and it did not instruct any of the contractors or their employees to use the stairs in connection with their tasks. [The p]laintiffs submitted no evidence to contradict these assertions." *Id.* at 219. As to the construction manager, the court explained that it could not be "inferred solely from LMB's contractual duties alone that LMB had the requisite supervision and control. [The p]laintiffs' reliance upon LMB's general supervisory

duties is misplaced, as such duties, in the absence of actual authority to control the activity bringing about the injury, will not suffice to hold a general contractor liable." *Id.* at 221.

The court noted that "the record shows that such authority was exercised solely by Reilly's supervisor, a Centrifugal employee, who decided to have Reilly and others continue raising the pipes by using the stairs. Thus, even if the hoist was inoperable for more than a full day, as plaintiffs contend, Universal cannot be liable for Reilly's injuries where the dangerous condition arose from the unsafe manner in which the work was being performed by another subcontractor, and Universal exercised no supervisory control over that work." *Id.* (citing *Comes v. New York State Elec. & Gas Corp.*, 82 N.Y.2d 876, 877-878 (1993)). The court also stated that "[i]n the first instance, it is arguable whether an inoperable hoist, by itself, should be considered a dangerous condition. It could just as reasonably be argued that the dangerous condition in this case arose solely by virtue of the determination by Reilly's employer to continue the strenuous work by using the stairs." *Id.* "However, even assuming an inoperable hoist may constitute a dangerous condition, the record discloses that Universal was notified of the problem by 12:00 P.M. and promptly responded within one hour." *Id.*

Much like in *Reilly*, it is first arguable whether the I-beam without an end stop is, itself, a dangerous condition. Plaintiff does not present any argument or case law supportive of such an assertion. Plaintiff contends that "issues of fact exist as to what steps Corning could have taken to discover the defect in question and eliminate the same by placing a permanent 'stop' on the end of the I-beam." Dkt. No. 74-1 at 25. He also states that "the defendant Corning provided Layne Christensen's employees with defective equipment in that the beam and hoist which they provided for Layne's work was defective in that there was no device to prevent it from coming off the end, something Corning's own investigation found was defective." *Id.* at 26-27. Plaintiff points the

Court to the 5Why Investigation which indicates that the Chain Hoist fell, in part, because there was no end stop on the beam. *See* Dkt. No. 74-15 at 9.

Although Stewart let Tripp and Plaintiff into the pump houses and McCann walked through the houses to inspect them, there is no evidence that any Corning employee "gave anything more than general instructions on what needed to be done, not how to do it, and monitoring and oversight of the timing and quality of the work is not enough to impose liability under [Labor Law] section 200." *Foley v. Consol. Edison Co. of New York*, 84 A.D.3d 476, 477 (1st Dep't 2011) (quotation omitted).

Corning states that between 2012 and 2018, Layne was the only company that performed work on the pumps. Corning employees did not work on the pumps during this time frame. *See* Dkt. No. 65-15 at ¶ 6. Layne admits the statement, but notes that Layne employees were not the only individuals present in the pump houses during that time frame. *See* Dkt. No. 73 at ¶ 6. Corning asserts that "Layne employees would place a vice grip or clamp on the I-beam to act as an end stop for the chain hoist trolley when performing this work as there was no permanent end stop on the I-beam." Dkt. No. 65-15 at ¶ 14. Layne denies this statement and states that "Phillip Tripp asserted that the clamps were in place when he arrived on prior occasions." Dkt. No. 73 at ¶ 14. Layne admits that its employees keep vice grips in their vehicles. *See id.* at ¶ 41.

Neither Corning nor Layne had actual or constructive notice that, at the time of the accident, there was no end stop on the I-beam. Therefore, liability hinges on whether Corning created the condition. Corning contends that Layne employees brought their own removable clamps, which is supported by Stewart's testimony. *See* Dkt. No. 65-15 at ¶ 14. Layne contends that the clamps were already in place at Corning, supported by Tripp's testimony. *See* Dkt. No. 73 at ¶ 14. Tripp testified that in 2012, when he first visited Corning, there was an end stop in place.

*See* Dkt. No. 65-9 at 48.  He also testified that he believed other people, unknown to him, used the Chain Hoist because Layne employees did not do work on the pump motors and the motors do not "last forever." *Id.* at 49.  He would also see new tags on the motors.  *See id.* at 49-50.  However, in Layne's response to Corning's statement of material facts, Layne admits that "[p]rior to May 14, 2018, Corning did not move or use the Chain Hoist for any reason. . . .  Likewise, no other contractors used the Chain Hoist."  Dkt. No. 65-15 at ¶ 19; *see* Dkt. No. 73 at ¶ 19.

Layne also relies on the testimony and 5Why investigation of VanCise.  *See* Dkt. No. 72 at 5.  In his investigation he listed one reason "why" the Chain Hoist fell under the "equipment" category as because "[n]o end stop on I-beam to keep assembly from falling."  Dkt. No. 74-15 at 9.  The report instructs the author to "[p]lace a red circle around the item(s) determined to be the root cause of the incident."  *Id.*  VanCise circled "oversite" for failing to include the chain hoist on an inspection list.  *Id.*

Plaintiff cites cases that set forth circumstances where there was a dispute concerning the defendant(s) "authority over the dangerous area of the worksite *and* notice of the unsafe condition."  *Locke v. URS Architecture & Eng'g-New York, P.C.*, 202 A.D.3d 505, 506 (1st Dep't 2022) (emphasis added) (explaining that the plaintiff "slipped and fell on soapy water on the floor of the restroom designated by URS" and  the plaintiff "regularly informed URS that the sink in the workers' restroom was overflowing, causing water to pool on the floor, and requested that the problem be remedied"); *see also* Dkt. No. 74-1 at 22-25; *Nusio v. Legend Autorama, Ltd.*, 219 A.D.3d 842, 842 (2d Dep't 2023) ("The ladder that the injured plaintiff was using slipped, allegedly causing him to fall and sustain injuries.  There was evidence in the record that automotive services were being performed on the defendants' premises by its employees, including changing oil filters and disposing the used oil filters into oil drums, and that oil was

dripping from a spigot attached to a barrel close to the location of the plaintiff's accident");

*Toalongo v. Almarwa Ctr., Inc.*, 202 A.D.3d 1128, 1129 (2d Dep't 2022) ("The plaintiff allegedly

sustained injuries when he slipped on ice, water, and debris in a stairwell while trying to support

the weight of a steel beam that was being lowered down to him by two coworkers on a scaffold

above him.  Here, the defendants failed to establish, prima facie, that they did not have actual or

constructive notice of an allegedly dangerous condition that contributed to the plaintiff's accident,

namely, cowater, ice, and debris in the stairwell where the plaintiff's accident occurred");

*Malvestuto v. Town of Lancaster*, 201 A.D.3d 1339, 1339 (4th Dep't 2022) (concluding, without

analysis, that "[t]here is a triable issue of fact whether plaintiff's injuries stemmed 'from a

dangerous condition on the premises' and whether defendant had 'control over the work site and

actual or constructive notice of the dangerous condition'"); *Davis v. Trustees of Columbia Univ. in

City of New York*, 199 A.D.3d 481, 482 (1st Dep't 2021) ("An alleged accumulation of debris may

constitute a dangerous condition. . . .  Defendants failed to establish that they lacked constructive

notice of the alleged accumulation of debris").  In those cases, without much explanation, the

courts concluded that there were issues of fact as to whether the defendant(s) created the

dangerous condition or had actual or constructive notice of it.

Plaintiff cites *Edwards v. State Univ. Constr. Fund*, 196 A.D.3d 778, 779 (3d Dep't 2021).

*See* Dkt. No. 74-1 at 23.  In *Edwards*, the plaintiff was working on a renovation project for the

SUNY Oneonta Physical Sciences Building when he hit his head on a wooden beam supporting a

scaffold and fell backwards down a set of stairs.  *See Edwards*, 196 A.D.3d at 779.  The court

explained that "it was the placement of the beam that created the alleged hazard.  Notably, the

scaffold was erected prior to the accident, the injury did not derive from any work performed on

the scaffold and Edwards was not engaged in his cleanup responsibilities at the time of the

incident." *Id.* Thus, the court applied a "dangerous condition theory of liability." *Id.* The

defendants acknowledged in deposition testimony that if they "deemed something to be unsafe,

[they] had the authority to stop work and direct necessary changes." *Id.* Additionally, three

different individuals who worked for the contractor or sub-contractor defendants testified during

their depositions that they had ducked under the beam and were therefore aware of it. *See id.*

Thus, the Court concluded that "there are questions of fact as to the issues of control and notice

sufficient to preclude dismissal of the common-law negligence and Labor Law § 200 claims . . . ."

*Id.*; *see also Lacey v. Lancaster Dev. & Tully Constr. Co., LLC*, 193 A.D.3d 1398, 1399 (4th

Dep't 2021) (modifying an order that granted summary judgment "because the parties agree that

the accident is alleged to have occurred as a result of a dangerous condition on the premises" and

"[w]ith respect to constructive notice, one witness testified that she walked through the area where

plaintiff fell earlier in the day, observed slurry in that location, and almost slipped in it").

      Here, neither Corning nor Layne have proven that they did not create the dangerous

condition. They each point the finger at the other entity, supported by deposition testimony which

states that Corning already had c-clamp end stops in place, or that Layne would bring and place

the clamps on the beam. It is not for the Court to decide which testimony is more credible.

Corning and Layne have established that they did not have actual or constructive notice of the

condition. Unlike the cases relied on by Plaintiff, this was not a circumstance where individuals

had been notified or had seen the condition and chose to ignore it. Even Plaintiff himself testified

that he did not see the missing end stop, such that he did not have notice of the condition. *See

Jackson*, 205 A.D.3d at 543 (emphasis added) ("[The d]efendants' witnesses all testified to a lack

of knowledge of the plywood ramp, thereby establishing lack of actual notice. However, [the]

plaintiff raised a triable issue as to constructive notice *by his deposition testimony and affidavit*

*that he had seen the plywood ramp in place when he began working at the construction site,*
although he never traversed it prior to his accident, which occurred months into his work, and that
defendants' trailers were located only 30 to 50 feet from where plaintiff's accident occurred.
Contrary to defendants' insinuations, the number of witnesses contradicting plaintiff's account is
not a basis for granting them summary judgment; it merely raises issues of credibility for the fact-
finder").  The Court concludes that there is a dispute sufficient to warrant denying summary
judgment to Corning or Layne as to Plaintiff's Labor Law § 200 and common law negligence
claims because it is disputed who created the allegedly dangerous condition.[9]  *See In re World*
*Trade Ctr.*, 44 F. Supp. 3d at 433 (emphasis added) ("Where a plaintiff's claim arises out of the
condition of the premises, a party is liable if (1) it created the dangerous condition causing the
injury *or* (2) failed to remedy a dangerous or defective condition of which he or she had actual or
constructive notice").  Although the Chain Hoist would not have fallen had Plaintiff, either
together with Tripp or individually, not pulled the chain, it also would not have fallen, had there
been a stop in place, regardless of how hard Plaintiff pulled the chain.  The jury is best suited to
determine whether and to what extent Plaintiff, Corning, or Layne's actions or inactions caused
the accident.

**F.      Contract Indemnification**

Corning argues that the language in the Indemnification Provision clearly and
unambiguously provides Layne's intent to indemnify Corning for proscribed losses that are

---

[9] Plaintiff spends much of his statement of material facts stating that there were two chain hoists
purchased by Corning.  *See* Dkt. No. 74-2 at ¶¶ 32-35.  Corning disputes the statement.  *See* Dkt.
No. 81-1 at ¶¶ 32-35.  Whether there were one or two chain hoists purchased by Corning does not
affect the outcome of the motions presently before the Court.  The issues are whether Plaintiff
was engaging in specific kinds of work under the proffered Labor Laws, and whether he, Corning,
or Layne were negligent in their conduct such that Plaintiff was injured.  Whether Corning
purchased a second chain hoist does not aide the Court in answering those questions.

"attributable to": (1) "the Products," or (2) "[Layne's] actions or omissions."  In its response,

Layne does not attempt to refute this argument.  *See* Dkt. No. 72-1.

Whether a writing is ambiguous is a question of law.  *See W.W.W. Assocs. v. Giancontieri*,

77 N.Y.2d 157, 162 (1990).  The right to contractual indemnification depends on the specific

language of the contract.  *See Kader v. City of New York*, 16 A.D.3d 461, 463 (2d Dep't 2005).

"A promise to indemnify should not be found unless it can be clearly implied from the language

and purpose of the entire agreement and the surrounding facts and circumstances."  *Laneuville v.

General Motors Corp.*, 93 F. Supp. 2d 272, 275 (N.D.N.Y. 2000) (quoting *Hooper Assocs., Ltd.

V. AGS Computs., Inc.*, 74 N.Y.2d 487, 491-92 (1989)).

The Court agrees that the language in the Indemnification Provision is clear and

unambiguous, and Layne does not contest the validity of the agreement or that Plaintiff was

performing work as defined under the agreement.  *See* Dkt. No. 65-15 at ¶¶ 21-24; Dkt. No. 74 at

¶¶ 21-24.  Rather, Layne argues that its obligation to indemnify Corning has not been triggered

because Corning was actively negligent in creating the condition that caused Plaintiff's injury.

*See* N.Y. GEN. OBLIG. LAW ("G.O.L.") § 5-322.1.  Section 5-322.1 prohibits the indemnification

of an actively negligent party by providing as follows:

> [R]elative to the construction, alteration, repair or maintenance of a
> building, structure, appurtenances and appliances including moving,
> demolition and excavating connected therewith, purporting to
> indemnify or hold harmless the promise against liability for damage
> arising out of bodily injury to persons or damage to property
> contributed to, caused by or resulting from the negligence of the
> promise . . . whether such negligence be in whole or in part.

G.O.L § 5-322.1; *see also Husted v. Cent. N.Y. Oil & Gas Co.*, 68 A.D.3d 1220, 1223 (3d Dep't

2009) ("[U]nless the proposed indemnitee is found to be free from active negligence, conditional

summary judgment for either common-law or contractual indemnification of a proposed

indemnitor is premature").  Courts have determined that broad indemnification clauses are valid to the extent that they insulate the indemnitee from liability only to the extent that the indemnitee is not itself negligent.  *See Itri Brick & Concrete Corp. v. Aetna Cas. & Sur. Co.*, 89 N.Y.2d 786, 794 (1993).  Thus, the Court must determine whether there is a genuine dispute of material fact as to whether Corning was actively negligent such that it could not be indemnified by Layne.

The Court first reiterates its skepticism in Layne's arguments where Layne argues both that Plaintiff is the sole cause of his accident, but that Corning was negligent in causing the accident.  *See* Dkt. Nos. 64, 73.  However, as explained, there is a dispute as to whether Corning created the dangerous defect and whether it caused Plaintiff's injury.  Thus, whether Corning can be indemnified by Layne depends on a jury's conclusion as to Corning's negligence.  As such, the Court denies Corning's motion against Layne.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that Third-Party Defendant's motion for summary judgment against Plaintiff (Dkt. No. 64) is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** that Defendant's motion for summary judgment against Plaintiff (Dkt. No. 66) is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** that Defendant's motion for summary judgment against Third-Party Defendant (Dkt. No. 65) is **DENIED**; and the Court further

**ORDERS** that Plaintiff's motion (Dkt. No. 74) is **DENIED** insofar as Plaintiff requested leave to amend his complaint; and the Court further

    **ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 28, 2024
        Albany, New York

                                      Mae A. D'Agostino
                                      U.S. District Judge